JAMES V. PROESEL AND ROSEMARY K. PROESEL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5995–76.     Filed December 27, 1979.

---

*Randall G. Dick*, for the petitioners.
*James F. Kidd*, for the respondent.

OPINION

SIMPSON, *Judge:* This matter is before us on the petitioners' motion in which they ask this Court to suppress evidence and to quash the statutory notice of deficiency on the ground that the information on which the notice was based was obtained as a result of an illegal search and seizure conducted by the Commissioner. In the alternative, the petitioners move that the burden of producing and going forward with proof be shifted to the Commissioner.

The issue in this case involves a deduction for partnership losses which the petitioner James V. Proesel claimed with respect to his alleged interest in Chico Enterprises (Chico) during 1971. Chico allegedly was a partner in Benwest Production Co. (Benwest), a partnership engaged in the movie production business. In their motion, the petitioners contend that the deficiency notices issued to them and to the other partners in Benwest were based upon evidence illegally obtained by the Commissioner through outrageous and illegal conduct. The conduct to which they refer is the extensive IRS investigation known as "Project Haven" or "Operation Trade Winds" and the infamous "briefcase incident" which transpired 6 years ago in the United States and the Bahamas.[1] The Commissioner concedes that the basic facts of the Project Haven affair are public knowledge and may be accepted as the factual premise upon which the petitioners' motion is based. For the purpose of

---

[1] The methods allegedly employed by the IRS in Project Haven obtained considerable notoriety in the national press and were the subject of an investigation in 1975 by a subcommittee of the Committee on Government Operations of the U.S. House of Representatives, chaired by Congressman Benjamin S. Rosenthal. See Oversight Hearings into the Operations of the IRS, 94th Cong., 1st Sess. (1975).

background information, we set forth the relevant facts dealing with Project Haven, as previously stipulated to by the Federal Government in other cases and as found by the District Court in *United States v. Payner*, 434 F. Supp. 113, 118–120 (N.D. Ohio 1977), affd. per curiam 590 F.2d 206 (6th Cir. 1979), cert. granted Oct. 1, 1979[2]:

In 1965 the Internal Revenue Service initiated Operation Trade Winds for the purpose of gathering information about the financial activities of American citizens in the Bahamas. Special Agent Richard Jaffe of the Jacksonville, Florida Office of the Internal Revenue Service (IRS) supervised the investigation. IRS agents gathered information pertinent to Operation Trade Winds by making numerous trips to the Bahamas and by the use of over 30 informants.

In June, 1972 the IRS suspected that the Castle Bank and Trust Company of the Bahamas functioned as an illegal tax haven for American taxpayers. The IRS' suspicion was based on information about an alleged California narcotics dealer, Allan Palmer, who deposited a check in his bank account originally drawn on the Castle Bank of the Bahamas. Further investigation revealed that the Castle Bank had an account with the Bank of Perrine in Florida, and that Palmer had $25,000 in a Castle Bank account which he opened through the assistance of the Bank of Perrine. In August, 1972 representatives of the IRS districts in San Francisco, Chicago, Miami, and Pittsburgh met in Jacksonville, Florida to discuss the involvement of the Castle Bank with respect to narcotic trafficking investigations pending in each district.

In late October, 1972, Special Agent Jaffe met with one of his informants, Norman Casper, and asked him to obtain the names and addresses of the individuals holding accounts with the Castle Bank. In the first week of November of 1972 Casper decided to secure the requested information and in late November of 1972, as part of the scheme to get the names of the Castle Bank depositors, Casper introduced Sybol Kennedy to Michael Wolstencroft. Wolstencroft was then an acquaintance of Casper's and Vice-President and Trust Officer of Castle Bank. Sybol Kennedy was a private detective employed by Casper. At the time Casper introduced Wolstencroft to Sybol Kennedy, Casper knew that Wolstencroft frequently traveled to the United States carrying a briefcase containing documents concerning the operation of the Castle Bank. In early January, 1973 Casper learned that Wolstencroft planned a business trip to the United States on January 15, 1973, and would have records of the Castle Bank in his possession during the trip.

In the week preceding January 15, 1973 Casper and Special Agent Jaffe discussed a covert plan to intercept copies of the documents that Wolstencroft planned to bring into the United States. On Tuesday, January 9, 1973 Casper told Jaffe that he could get the documents from Wolstencroft but that he needed Jaffe to supply photographic services, and on Thursday, January 11, 1973 Casper outlined to Jaffe his plan to get the documents from Wolstencroft. Casper specifically told Jaffe that he planned to enter an apartment from which he expected to remove Wolstencroft's briefcase. Jaffe told Casper that he would have to clear such an operation with his superior, Troy Register, Jr.,

---

[2]See also *United States v. Baskes*, No. 77 CR 238 (N.D. Ill., June 13, 1979, 44 AFTR 2d 79–5206, 79–2 USTC par. 9437), on appeal (7th Cir., July 12, 1979).

Chief of the IRS Intelligence Division in Jacksonville. After obtaining authorization from Register, Jaffe told Casper to proceed with the operation. On Friday, January 12 Casper phoned Jaffe and asked if the IRS could refer him to a locksmith who could be "trusted," which Jaffe did.

On January 15, 1973 Wolstencroft arrived in the United States and went to Sybol Kennedy's apartment. What occurred at her apartment, if anything, was not brought out at trial. However, at 7:30 p.m. Sybol Kennedy and Wolstencroft left Kennedy's apartment to go to a restaurant on Key Biscayne, whereupon Casper entered the apartment with a key given him by Kennedy, and removed Wolstencroft's briefcase without permission. Casper took the briefcase to a locksmith who had been recommended by the IRS, and who had previously refused to enter the apartment with him. Casper met the locksmith in a parking lot five blocks from Kennedy's apartment and instructed him to make a key for the briefcase. Casper then took the briefcase to an IRS agent's private residence, selected by Jaffe as the rendezvous point, and opened it in Jaffe's presence. Over 400 documents were taken out of the briefcase and photographed.

Jaffe, Casper, and an IRS photography expert used two cameras to photograph the documents, a "normal" camera and a microfilm camera. The microfilm camera was used because it was faster than a normal camera, and Agent Jaffe knew that the briefcase had to be returned to Sybol Kennedy's apartment before she and Wolstencroft got back from dinner. To get the briefcase back timely Casper had Kennedy and Wolstencroft watched during their dinner. When Kennedy and Wolstencroft completed their dinner, Casper's lookout phoned him at the residence which the IRS used to photograph the documents. After all documents were copied, Casper closed the briefcase, accidentally broke off the key in the lock, and returned the documents to Kennedy's apartment at approximately 9:00 p.m.

Within the next two weeks Jaffe again met with Casper and told him that additional information concerning Castle Bank's customers was needed. Casper obtained the requested additional information by sending Sybol Kennedy to the Bahamas to visit Wolstencroft. While there she stole a rolodex file from his office as Casper directed her to do. The stolen rolodex file was then turned over to Jaffe, who expressed no concern over the methods used to obtain it.

Casper was paid $8,000 in cash by the IRS for obtaining the information relating to Castle Bank. Sybol Kennedy was paid approximately $1,000 by Casper from funds he received from the IRS for her part in obtaining the briefcase and the rolodex.

[Fn. refs. omitted.]

The Commissioner has admitted that the name Benwest Production Co. was obtained as a result of the information gathered through the briefcase and rolodex incidents.[3]

---

[3]As to the contents of the briefcase in general, the District Court in *United States v. Baskes* observed:

"The names of at least 300 persons and a number of entities and trusts appear on page after page of

In June or July 1973, Revenue Agent Larry L. Gregg was assigned to assist in the Project Haven investigation. He analyzed the Castle Bank & Trust Co. records and worked with Special Agents David L. Ellison and Richard Jaffe. Mr. Gregg was later assigned by Agent Ellison to audit Benwest, and he was under the direction of the Project Haven coordinators while conducting the audit. During the course of the audit, Mr. Gregg met with Jerry Weiss, the accountant for Benwest. All information regarding Benwest's operations used by Mr. Gregg was provided by Mr. Weiss. Mr. Gregg forwarded such information to the Project Haven staff; but, he never informed Mr. Weiss that he was reporting to the staff, nor that he was connected with Project Haven in any way. Statutory notices of deficiency were issued to the petitioners and to the other partners of Benwest as a result of Mr. Gregg's audit. The deficiencies were based on the disallowance of partnership losses on the grounds that partnership production costs and interest expenses were not properly deductible.

Through discovery, the petitioners in this and related cases[4] sought to examine the Commissioner's files to determine whether there was any connection between the commencement of these cases and the Project Haven investigation, and on the Commissioner's refusal to make such files available, the petitioners made a motion for an order to compel production of the files. In addition, the petitioners filed a motion with this Court requesting that we order the Commissioner to review the contents of the briefcase and rolodex obtained as part of the Project Haven investigation and report to them and the Court as to whether the names of any of the petitioners, or any of the movie production partnerships in which the petitioners were partners, were contained therein. After a hearing on such motion, this Court granted the petitioners' motion. As ordered, counsel for the Commissioner filed a report, and a supplemental report, revealing that the names of many of the petitioners were contained in the briefcase and rolodex materials.

Subsequently, there was a hearing to establish how the audits

---

the briefcase files with no identification as to any detail except an assigned number. Although addresses are given in some instances, many persons are named without any address or even a full identification. * * * [442 F. Supp. 322, 327 (N.D. Ill. 1977), on appeal (7th Cir., Dec. 5, 1977).]"

[4]This action was taken in 72 cases, all involving partners in partnerships engaged in the movie production business.

in the cases were conducted and what information was used therein, and the Court ordered the Commissioner to produce his files for an in camera inspection. After such hearing and inspection, the Court directed the Commissioner to supply the petitioners with all the documents in his files which had any bearing on the connection between the audit and the Project Haven investigation and which were not privileged in some manner.

On October 30, 1979, the petitioners filed the motion presently before the Court in which they contend that the evidence upon which the deficiency notice was issued was obtained as a result of an illegal search and seizure conducted by the Commissioner. The petitioners contend that the use of evidence so obtained would violate their due process rights under the Fifth Amendment to the U.S. Constitution, and that this Court should exercise its supervisory powers over the administration of justice and suppress such evidence on that ground as well. The petitioners assert that "The facts clearly reveal that the Petitioners' Statutory Notices were based on the outrageous and illegal conduct" of the Commissioner, and that "all of the information obtained by Gregg during the course of his audit came into the possession of the government by virtue of what it learned from the briefcase."

The Commissioner, on the other hand, contends that the only evidence uncovered by the briefcase incident was the name of the Benwest partnership. He points out that the record of this case shows that the audit by IRS was soley based on evidence obtained independent of the Project Haven investigation. He claims that such information is so attenuated from the briefcase incident that any possible "taint" has been dissipated. We must agree.

As a general rule, this Court will not look behind a deficiency notice to examine the evidence used, the propriety of the Commissioner's motives, or the administrative policy or procedure involved in making his determinations. *Jackson v. Commissioner*, 73 T.C. 394 (1979); *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974); *Human Engineering Institute v. Commissioner*, 61 T.C. 61, 66 (1973). However, where infringements of constitutional rights have been alleged, the Court has carefully scrutinized the determination and imposed sanctions to discourage the Commissioner's use of and reliance on constitu-

tionally inadmissible evidence. *Suarez v. Commissioner*, 58 T.C. 792, 814 (1972).

It has been clearly established that evidence seized through an illegal search and seizure will be excluded in a criminal trial, whether that trial be in a State or Federal court, and whether the evidence was seized by Federal or State officials. *Ker v. California*, 374 U.S. 23 (1963); *Mapp v. Ohio*, 367 U.S. 643 (1961); *Elkins v. United States*, 364 U.S. 206 (1960); *Weeks v. United States*, 232 U.S. 383 (1914). The rationale given in support of the exclusionary rule is twofold: (1) There is the necessity of deterring law enforcement officers from using illegal and unconstitutional procedures to obtain evidence of a crime[5] (see, e.g., *United States v. Peltier*, 422 U.S. 531, 538–539 (1975); *United States v. Calandra*, 414 U.S. 338, 347–348 (1974); *Elkins v. United States, supra* at 217); and (2) there is the necessity of maintaining the integrity of the judicial process (see, e.g., *Brown v. Illinois*, 422 U.S. 590, 599 (1975); *Mapp v. Ohio, supra* at 659; *Elkins v. United States, supra* at 222). Moreover, it is said that the decision of whether to invoke the exclusionary rule must be made by weighing the social interest in ascertaining the guilt of the accused against the competing social interest of deterring Government officials from obtaining evidence in a manner that violates the Consititution. *United States v. Janis*, 428 U.S. 433, 454 (1976). In *Suarez v. Commissioner, supra*, we extended the protection of the exclusionary rule to proceedings before this Court, and held "that, as a matter of law, the protective rule of the fourth amendment which excludes evidence illegally obtained is applicable in a civil tax case."[6] (58 T.C. at 806.)

It has been recognized that there are three bases for excluding reliable, probative evidence gathered through an illegal procedure. First, there is the constitutional principle rooted in the Fourth Amendment that any evidence obtained by a Government in violation of the right to be free of unreasonable searches and seizures shall be excluded from consideration against the person whose privacy interest has been invaded. *Alderman v. United States*, 394 U.S. 165, 171–172 (1969); see, e.g., *Mapp v.*

---

[5]However, in *United States v. Janis*, 428 U.S. 433, 446–454 (1976), the Supreme Court questioned the utility of the exclusionary rule in actually deterring the illegal activity of law enforcement officers. See also *United States v. Payner*, 434 F. Supp. 113, 131 (N.D. Ohio 1977).

[6]See, however, the Supreme Court's statements in *United States v. Janis*, 428 U.S. at 456–457, regarding our decision in *Suarez*.

*Ohio,* 367 U.S. at 655. A person who asserts a violation of Fourth Amendment rights must have standing to assert the unlawfulness of the search and seizure; that is, the movant must have a privacy interest in the object of the illegal search and seizure. *Alderman v. United States, supra* at 171–172. The petitioners here do not assert any violation of their Fourth Amendment rights since it is clear they had no privacy interest in the documents seized through the briefcase and rolodex incidents. See *United States v. Payner,* 434 F. Supp. at 126. The second ground for excluding evidence is based on the due process rights under the Fifth Amendment and provides that, where evidence is seized from an individual in a manner so outrageous that it shocks a court's conscience, then the evidence so obtained must be excluded from the court's consideration. See *Lego v. Twomey,* 404 U.S. 477, 485–486 (1972); *Jackson v. Denno,* 378 U.S. 368, 385–386 (1964); *Rochin v. California,* 342 U.S. 165, 169–174 (1952). The third ground occurs when a court invokes its inherent supervisory powers to exclude evidence which was obtained in a manner so inconsistent with American standards of justice that the integrity of the Federal judicial system would be called into question if the evidence were admitted for the court's consideration. See *Elkins v. United States,* 364 U.S. at 216–223; *McNabb v. United States,* 318 U.S. 332, 340–344 (1943). When a party seeks to exclude evidence on the second or third ground, it is not clear as to what he must prove in order to show that his rights have been violated and to show that he has standing to raise the issue. See *United States v. Payner,* 434 F. Supp. at 129 n. 65. The petitioners ask this Court to exclude the evidence they allege was illegally obtained on the latter two theories.

The petitioners argue, in essence, that all information voluntarily given to Revenue Agent Gregg by the accountant for Benwest during the course of the civil audit was illegally obtained because the IRS illegally obtained the identity of Benwest and commenced the audit as a result thereof. However, it is well established that the exclusionary rule has no application where the Government learns of evidence "from an independent source" (*Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392 (1920)), or where the challenged evidence has "become so attenuated as to dissipate the taint" (*Nardone v. United States,* 308 U.S. 338, 341 (1939)). *Wong Sun v. United*

*States*, 371 U.S. 471, 488 (1963); *Singleton v. Commissioner*, 65 T.C. 1123, 1148 (1976), affd. on another ground 606 F.2d 50 (3d Cir. 1979).

The information on which the deficiency notice in this case was based was obtained from sources totally independent of the material contained in the illegally seized briefcase and rolodex. See, e.g., *United States v. Baskes*, 442 F. Supp. 322, 329 (N.D. Ill. 1977), on appeal (7th Cir., Dec. 5, 1977). Such information was provided voluntarily by Mr. Weiss, the accountant for Benwest, during the course of a civil tax audit. Cf. *Wong Sun v. United States*, *supra* at 488. Therefore, in the present case, there have been "numerous intervening legal acts" on the part of the Commissioner after he initially obtained the name of the partnership by virtue of the briefcase and rolodex incidents "which are more than sufficient to break the causal connection between the illegal search and the evidence to be introduced at trial." *Singleton v. Commissioner*, 65 T.C. at 1149. The situation presented in this case is also not one where the evidence used by the Commissioner was obtained as a result of "both legal and illegal leads." See *United States v. Schipani*, 414 F.2d 1262, 1266 (2d Cir. 1969). The only "tainted" evidence that was obtained through the briefcase incident was the name of the partnership. All the evidence on which the civil tax liability of the petitioners was determined was gathered through the audit of Benwest. Moreover, as this Court stated in *Singleton:*

we are convinced that it would be stretching the exclusionary rule beyond reasonable bounds to hold in every case in which the identity of an individual is somehow illegally obtained that all information subsequently acquired must be suppressed. * * * [65 T.C. at 1148.]

See also *United States v. Sand*, 541 F.2d 1370, 1376 (9th Cir. 1976).

Furthermore, the argument that evidence is tainted merely because it would not have been discovered *but for* the illegal activity, has been rejected in numerous cases. As the Supreme Court stated in *Wong Sun v. United States*, 371 U.S. at 487–488:

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. * * *

The Supreme Court recently reaffirmed this position in *United States v. Ceccolini*, 435 U.S. 268, 276 (1978), when it stated:

Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a *"per se* or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with * * * [the illegal activity]. * * *

See also *United States v. Brandon,* 467 F.2d 1008 (9th Cir 1972); *United States v. Fike,* 449 F.2d 191 (5th Cir. 1971); *United States v. Bacall,* 443 F.2d 1050 (9th Cir. 1971); *United States v. Friedland,* 441 F.2d 855 (2d Cir. 1971).

There can be no doubt that some sort of causal nexus existed between the information obtained through the briefcase and rolodex incidents (that is, the name of the Benwest partnership) and the subsequent civil tax audit of Benwest and its partners. However, as the Seventh Circuit recently stated in *United States v. Carsello,* 578 F.2d 199, 202 (1978), the question of whether the audit would not have occurred but for the illegal action of the IRS—

cannot be answered on the basis of "causation in the logical sense alone," but necessarily involves a weighing of the social costs of applying the exclusionary rule against the benefits to be gained therefrom, for the "penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *United States v. Ceccolini,* * * * [435 U.S. at 279] * * *

Here, the audit was wholly based on legally obtained evidence, and to exclude such evidence would bear no relation to any public purpose.

Lastly, the petitioners' reliance on the cases of *United States v. Payner,* 434 F. Supp. 113 (N.D. Ohio 1977), affd. per curiam 590 F.2d 206 (6th Cir. 1979), cert. granted Oct. 1, 1979, and *United States v. Baskes,* No. 77 CR 238 (N.D. Ill., June 13, 1979, 44 AFTR 2d 79–5206, 79–2 USTC par. 9437), on appeal (7th Cir., July 12, 1979), is misplaced. In those cases, the courts found that the information on which the indictments were based was directly related to the illegally seized briefcase and rolodex material. See *United States v. Payner,* 434 F. Supp. at 123. Therefore, there was not the same "attenuation of the tainted evidence" as presented in the case before us. *Suarez v. Commissioner,* 58 T.C. at 812, is distinguishable on the same grounds since this Court found that the deficiency notice in that case was based on the illegally seized records of the taxpayer.

In the light of our finding that there was a complete

attenuation between the evidence "illegally" obtained—the name Benwest—and the subsequent independent information obtained through a civil tax audit on which the deficiency notice in this case was issued, we hold that there are no grounds for applying the exclusionary rule in the present case. The petitioners' due process rights under the Fifth Amendment were not violated since the deficiency notice was based on legally obtained evidence; there is no ground for the Court to exercise its supervisory powers to suppress any evidence on which such notice was based; and there are no grounds to shift the burden of producing and going forward with proof to the Commissioner. In view of those conclusions, we do not reach the questions that would arise if the notice had been based on illegally obtained evidence, such as, the question of whether the petitioners have standing to seek an exclusion of an alleged violation of their rights under the Fifth Amendment or by invoking the "supervisory powers," or the question of whether the exclusionary rule should continue to be applied in civil cases before this Court (compare *Suarez v. Commissioner, supra,* with *United States v. Janis, supra*).

<div align="right">

*An appropriate order will be issued.*