W. Kenneth Riland and Gladys G. Riland, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 6854–79.    Filed August 2, 1982.

*Boris Kostelanetz* and *Edward J. Daus,* for the petitioners.
*Richard M. Campbell* and *Michael N. Balsamo,* for the respondent.

## OPINION

NIMS, *Judge*: This case is before us on petitioners' motion for summary judgment or, in the alternative, suppression of evidence. The issues for decision are: (1) Whether the alleged loss of the Department of Justice's files relating to petitioner W. Kenneth Riland in 1973 constitutes a violation of petitioners' due process rights; (2) whether respondent has engaged in unconstitutional delay in issuing his statutory notice of

deficiency to petitioners; (3) whether petitioners' rights to due process have been violated by spoliation and intentional destruction of evidence allegedly engaged in by respondent's agents; and (4) whether petitioners' books and records were improperly obtained by respondent by means of an alleged conspiracy between petitioners' accountant and respondent's agents in violation of petitioners' rights under the Fourth, Fifth, and Sixth Amendments to the Constitution. For each of these alleged violations, petitioners seek either the entry of summary judgment against respondent or, alternatively, suppression of certain possible testimony or documentary evidence.

Pursuant to Rule 121,[1] petitioners and respondent filed affidavits with exhibits in connection with the instant motion. These documents and the pleadings contain the facts used for purposes of this motion. Rule 121(b). Certain material facts, as to which there is no genuine issue, follow. Where a genuine issue exists, we so indicate.

Petitioners Dr. W. Kenneth Riland (hereinafter referred to as petitioner or Dr. Riland) and Gladys G. Riland, husband and wife, resided at New York, N.Y., at the time the petition was filed.

Dr. Riland, a prominent New York City osteopath, during the years 1962–70 numbered among his patients such notable figures as former President Richard M. Nixon and the late Vice President Nelson A. Rockefeller. During this period, petitioner retained two accountants: one, Norman Goffner (Goffner), to keep his books and records, and another, Bernard Weiner (Weiner), to prepare his Federal income tax returns.

In March 1971, Revenue Agent Stanley Ringel (Ringel) was assigned to audit petitioner's 1969 income tax return. On May 21, 1971, Ringel began a field audit of Dr. Riland's return at Weiner's offices. During the morning of that day, Ringel reviewed numerous records relating to the 1969 tax year. Shortly after lunch, Ringel made a routine request to see passbooks relating to any savings accounts maintained by petitioners. Ringel wanted to look for any unreported interest

---

[1]All references to Rules are to the Tax Court Rules of Practice and Procedure. Additionally, unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years at issue.

income or unexplainable cash deposits. Weiner did not have possession of any passbooks, so he and Ringel proceeded to Dr. Riland's offices where Ringel was introduced to Dr. Riland, and two savings account passbooks were produced. Weiner and Ringel then returned to Weiner's offices, where Ringel reviewed the contents of the passbooks.

Ringel noted approximately $19,000 in deposits to these accounts in 1969 and asked Weiner if he knew the source of the deposits. Weiner said he did not. At that point, photostatic copies of the two passbooks were made for Ringel to keep. Years other than 1969 covered by the passbooks were also photocopied.

It is respondent's position in this case that these unexplained deposits (both in 1969 and several other years) represented, in part, per visit fees paid on behalf of Richard M. Nixon and retainer fees from Nelson A. Rockefeller, which amounts were neither revealed to petitioners' accountants nor reported by petitioners as income.

On May 25, 1971, Ringel met Dr. Riland at the latter's office. A line on Ringel's "Examining Officer's Activity Record," intended to be a contemporaneous memorandum, contains the following entry for that date: "Appt. 3:30 P.M. at Dr. Riland's office—questioned about deposits to sav. a/cs—could not offer explanation."

In a handwritten draft of a report dated September 22, 1971, from Ringel to the Chief of the Audit Division, Ringel described the events of May 25, 1971, as follows:

> Appointment made 3:30 pm at Dr. Riland's office to discuss with Dr. Riland source of deposits. Dr. Riland could offer no plausible explanation why the deposits were not included in gross income and he stated that perhaps I should have him put into jail.

Ringel's Group Chief, Bernard Singer, crossed out the words "and he stated that perhaps I should have him put into jail" on this draft.

A second handwritten draft of this report was prepared by Ringel. In this second draft, Ringel described the events of May 25, 1971, as follows:

> Appointment made at Dr. Riland's office to discuss with the taxpayer source of deposits. Dr. Riland could offer no possible explanation why the deposits were not included in gross income.

After editing by Ringel's Branch Chief, a third handwritten draft of the above passage read as follows:

Appointment made at Dr. Riland's office to discuss with the taxpayer the source of deposits. Dr. Riland could offer no possible explanation *as to the source of the deposits and* why the deposits were not included in gross income. [Emphasis added as to additional language.]

This third draft was then typed and signed by Ringel.

Sometime in late 1971 or early 1972, Special Agent Sidney Connor (Connor) and Ringel prepared a typewritten summary of Ringel's contacts and interviews with Dr. Riland. In regard to the events of May 25, 1971, this summary, signed by Ringel only, stated:

On 5/25/71 I went to Dr. RILAND'S office where I spoke to him. At this conference when I asked him to explain the source of unexplained deposits for 1969, Dr. RILAND stated that he did not know the source of the deposits and did not know why the deposits were not included in Gross Receipts.

Dr. RILAND held out his hands and said to me "Arrest Me" at this conference.

At Dr. Riland's criminal trial, discussed *infra*, Ringel testified that on May 25, 1971, in response to Ringel's inquiries, Dr. Riland stated that—

He [Dr. Riland] had no idea what the source of these deposits were, and his secretary usually handled his deposits into bank accounts, and she was on vacation, and he could offer me [Ringel] no explanation of what the deposits represented. Then he also held up his hands and said, "Well, what are you going to do now, arrest me?"

Ringel further testified that he told Dr. Riland he was not there to arrest him, but only to find out the source of the deposits.

In June 1971, Dr. Riland signed a power of attorney appointing Weiner as the doctor's representative before the Internal Revenue Service (IRS) with respect to the taxable years 1969 and 1970. Shortly thereafter, Ringel referred his investigation to the Intelligence Division and began investigating Dr. Riland for possible criminal fraud under the supervision of Special Agent Joseph T. Della Porta (Della Porta).

On September 30, 1971, Special Agent Della Porta and Ringel met with Weiner at the accountant's offices and read

him the text of Internal Revenue Manual (Administration) sec. 9384.2(2)(a)(b) (essentially, *Miranda*-type warnings).[2] Weiner then released to the agents his accounting firm's folders for the years 1967 through 1970 containing data used to prepare Dr. Riland's returns in those years. Weiner also turned over to the agents Riland's cash receipts and disbursements books covering the years 1962 to 1971. As the agents departed, Weiner asked whether he should notify Dr. Riland about the new criminal nature of the audit. The agents said they could not offer any advice on such a subject, and Weiner stated that he would not tell Dr. Riland of the Intelligence Division interest at that time because the doctor was "nervous enough about the matter, as is."

On October 14, 1971, Weiner turned over to Della Porta and Ringel Dr. Riland's 1969 checking account records without his specific knowledge of this fact. On November 17, 1971, when Weiner was asked several questions by other special agents regarding Dr. Riland's 1967 and 1968 tax years, Weiner expressed surprise. He told the agents that he did not know that any years other than 1969 or 1970 were being investigated and that had he known the agents were interested in prior years he would have advised Dr. Riland to retain an attorney. Weiner then refused to answer any further questions relating to the years 1967 and 1968 and referred the agents to Dr. Riland, himself, to answer their questions.

Since the beginning of the investigation to the date of the instant motion, Weiner and Dr. Riland have consistently disagreed as to whether or not Weiner ever saw the savings account passbooks in which the alleged unreported income was purportedly deposited.

In November 1971, Special Agent Connor replaced Special Agent Della Porta in supervising the investigation of Dr. Riland. Subsequent to his acquiring this assignment, Connor interviewed numerous individuals regarding Dr. Riland. Connor took handwritten notes of these interviews (including interviews with Dr. Riland) and later fully incorporated these notes into more formal typewritten memoranda of the interviews. Connor later destroyed the handwritten interview

---

[2]See *Miranda v. Arizona*, 384 U.S. 436 (1966).

notes. At Dr. Riland's criminal fraud trial in 1974, see *infra*, Connor testified that he destroyed these notes in part because there was no reason to keep the notes after they had been incorporated into a formal memorandum and in part because—

It is my understanding that if the notes are available at the time the witness takes the stand the attorney can use the notes to find inconsistencies and impeach the witness, so, therefore, it is a good policy not to give the attorney this type of material.

On May 24, 1972, Connor conducted an interview of Weiner that was stenographically recorded by a third party. At this interview, according to the original stenographic notes, the following colloquy took place (Connor questioning Weiner):

Q. 130      Did you, or a member of your firm, look at the cash receipts book to analyze what that cash receipts was made up of?
A.      We should have.
Q. 131      Was it done?
A.      It should have been done. Thank you. All I can tell you is that I can't tell you what my men did. We have all different calibers of tax men in our firm. *I did it. I accounted for every entry in the cash receipts book.*

In the transcription of the stenographic notes to a typewritten record, the italicized portion of the above passage was, for unknown reasons, left out.

At some point in the investigation of Dr. Riland, a Department of Justice file on the doctor was created. A Department memorandum obtained by petitioners, dated July 18, 1973, reports the loss of the doctor's file several weeks earlier and an ensuing unsuccessful search therefor. The current Department of Justice file contains original documents of the Department bearing dates prior to July 1973.

Following further investigation of Dr. Riland and the empaneling of a grand jury, he was indicted for attempting to evade income taxes for the years 1966 to 1970, inclusive, in violation of section 7201. A jury trial, with pretrial hearings, lasting almost 12 weeks and producing more than 6,000 pages of transcript and hundreds of exhibits, then ensued; Dr. Riland was acquitted on May 10, 1974. Dr. Riland was represented at this trial by Boris Kostelanetz.

Within a month after petitioner's acquittal, Kostelanetz (petitioners' attorney) contacted the IRS in an effort to resolve

any possible civil claims the Government might still have against Dr. Riland. On August 4, 1974, Revenue Agent Harry Schneider received the administrative files of the case for his review prior to an audit conference ultimately held on September 5, 1974. Petitioners' attorney thereafter sought either (1) the review of his clients' case by an IRS representative who had been neither a witness nor a participant in the criminal case or the investigation leading thereto or (2) the issuance of a 30-day letter; he was denied the former in October 1974, but granted the latter on March 21, 1975. The 30-day letter was issued based on Agent Schneider's examination and recommendation completed on December 13, 1974, which was further reviewed internally by the IRS.

On April 17, 1975, petitioners' attorney protested the 30-day letter. Thereafter, in both May and September 1975, petitioners' attorney met with the District Conferee and urged the Conferee to consider the trial transcript and the exhibits of the criminal trial. After various internal IRS communications on this request, on April 28, 1976, the Audit Division advised petitioners' attorney that it would consider the entire transcript and exhibits, or any portion thereof, which petitioner would like to submit within the next 30 days. Petitioners' attorney, contending it was the IRS's responsibility to obtain the transcript and exhibits, refused to submit any of these items, and, as a result, Agent Schneider referred Dr. Riland's case to the Appellate Division in June 1976.

On July 19, 1976, Appellate Conferee Sidney Gluck (Gluck) held the first of three conferences with petitioners' attorney. At the second conference, held on October 22, 1976, petitioners' attorney promised to supply Gluck with further information. On November 16, 1976, Gluck received from petitioners' attorney a copy of the latter's closing statement in Dr. Riland's criminal trial.

After a third conference, on May 16, 1977, petitioners' attorney on or about June 1, 1977, wrote Gluck indicating that he had discovered that the Department of Justice file on Dr. Riland had been lost in 1973. Petitioners' attorney raised a legal argument that the Government was required to show that exculpatory evidence was not contained in the "lost" file.

During the period from June 1, 1977, through June 25, 1978, Gluck analyzed the files and the legal arguments presented by

petitioners' counsel. During this time, Gluck prepared and wrote his report, which report was processed and reviewed by his superiors.

On February 23, 1979, the IRS Regional Counsel's Office approved the issuance of a statutory notice of deficiency. In the statutory notice of deficiency, issued March 2, 1979, respondent asserted deficiencies and additions to tax as follows:

| Year | Deficiency | Addition to tax sec. 6653(b) |
|------|------------|------------------------------|
| 1962 | $3,872.93  | $1,936.46 |
| 1963 | 6,003.09   | 3,001.54 |
| 1964 | 6,598.41   | 3,965.59 |
| 1965 | 8,948.60   | 4,474.30 |
| 1966 | 14,854.13  | 7,427.06 |
| 1967 | 12,522.90  | 6,261.45 |
| 1968 | 21,786.51  | 10,893.25 |
| 1969 | 16,027.20  | 8,013.60 |
| 1970 | 12,401.60  | 6,200.80 |

In the years between the time Dr. Riland was acquitted and the statutory notice of deficiency was issued, two potential witnesses in the instant case died: Rosamond Dohoney, Dr. Riland's administrative assistant/secretary/nurse died of cancer on August 12, 1974; Nelson A. Rockefeller (whom petitioners intended to call as a character witness) died on January 26, 1979. Neither witness testified at Dr. Riland's criminal trial.

Petitioners raise several constitutional arguments which they contend either entitle them to summary judgment as to all the asserted deficiencies and additions to tax or, alternatively, require the suppression of certain evidence.

## Lost File

Petitioners first argue that the loss of the Department of Justice file in 1973 has prejudiced their case in that relevant evidence may now be forever lost. As a remedy for the loss of the file, petitioners ask us either to render summary judgment in their favor or preclude the respondent from offering proof on subject matters which reasonably may have been within the file before it was lost.

Respondent, on the other hand, argues that the lost file was only temporarily misplaced, that petitioners have all the relevant evidence from the alleged lost file and that, in any event, the simple loss of the Government's own file (a file containing only Government records) is not a sufficient ground for either summary judgment or suppression. Whether the file was permanently lost, as petitioners assert, or only temporarily mislaid, as respondent maintains, is a disputed fact which we could not decide without an evidentiary hearing. However, for reasons hereinafter stated, we need not decide this question.

We agree with respondent that, whether or not the file was permanently lost, petitioners are not entitled to summary judgment or suppression on this issue. First, the present Department of Justice file contains original documents of the Department bearing dates prior to the date the file was reported lost. Any argument by petitioners that only the correspondence file was recovered and that other documents are still missing, is, we think, mere speculation considering the fact that petitioners concededly have no knowledge of what was originally contained within the Department of Justice file.

Second, even assuming a permanent loss of the Government file, we do not think this a sufficient ground for summary judgment or suppression where, as here, the lost file contained none of petitioners' own records and there is no evidence that losing the file was intentional. Cases cited by petitioners are all factually distinguishable: *United States v. Heath*, 147 F. Supp. 877 (D. Hawaii 1957), appeal dismissed 260 F.2d 623 (9th Cir. 1958), involved a situation where the Government, in a criminal tax fraud case, lost the defendant's books and records which had been obtained for investigative purposes; a motion to dismiss the indictment was granted when the court concluded such records were crucial to the defense of the case. *United States v. Consolidated Laundries Corp.*, 291 F.2d 563 (2d Cir. 1961), involved the granting of a new trial in an antitrust case when the Government negligently failed to turn over all the papers in its files relating to a prosecution witness after the trial court had ordered their production. *Robida v. Commissioner*, 371 F.2d 518 (9th Cir. 1967), vacating and remanding a Memorandum Opinion of this Court, involved a situation where the IRS had obtained various records of the taxpayer

from the German police, but did not make these records available to the taxpayer before his Tax Court trial. The Government moved to remand the case for a new trial because of its conceded error, and the court ordered the Government, in the new trial, to turn over to the taxpayer all of the taxpayer's personal documents and to explain why it was not or could not be in possession of all the taxpayer's records seized by the German police.

Unlike the situation in *Heath*, the petitioners here do not claim that the Government lost their records. Nor, as in *Consolidated Laundries* or *Robida*, do petitioners claim the Government is withholding from them material evidence which it has had all along and continues to have. Here, petitioners merely speculate that the Government may have had evidence in its files at one time which might have helped their case or provided evidentiary leads and that it no longer has such evidence.

Though the lost file (if indeed lost) may have contained material evidence, petitioners have neither identified nor even suggested any specific item. We note the words of the Supreme Court in *United States v. Agurs*, 427 U.S. 97, 109–110 (1976): "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Since petitioners have not shown that any documents in the lost file were material in a constitutional sense, they are entitled to no due process relief.

### Delay in Issuing Deficiency Notice

Petitioners next argue that upon Dr. Riland's acquittal in the criminal fraud case in May 1974, due process required respondent immediately to issue a deficiency notice to recover the amounts at issue, since respondent had all the facts necessary to determine such deficiencies and additions at that time. Petitioners contend that respondent's waiting until March 1979 to issue a deficiency notice, coupled with his alleged violations of his own procedures (as set out in the Internal Revenue Manual) violated their due process rights. Since, in the interim period, two witnesses petitioners intended to call at the trial of the instant case have died, petitioners argue that they are entitled either to summary judgment or to

an order precluding respondent from offering proof on subject matters relating to issues on which such witnesses would have testified.

Respondent, on the other hand, argues (1) that he was under no obligation to issue a notice of deficiency at any particular time because of the unlimited period for assessment and collection of taxes applicable to fraud proceedings (see sec. 6501(c)), (2) that, in any event, there was no unreasonable delay in issuing the instant notice, and (3) that petitioners have failed to show real prejudice as a result of any delay.

Whether or not the due process clause of the Fifth Amendment requires respondent to issue a notice of deficiency in civil fraud cases when he has completed all the investigating he deems necessary to issue a notice is, so far as we are aware, an issue that has never before been litigated. The closest case petitioners have cited to support their position is *Dowell v. Commissioner*, 614 F.2d 1263 (10th Cir. 1980), revg. and remanding 68 T.C. 646 (1977). In *Dowell*, the taxpayers initially filed fraudulent income tax returns, but subsequently filed nonfraudulent amended returns for the same years. The Government argued that since the initially filed returns were fradulent, under section 6501(c), it had an unlimited period in which to issue a notice of deficiency. The taxpayers, on the other hand, contended that the subsequent filing of the amended nonfraudulent returns fully informed the Government of their tax position and, accordingly, started the running of the normal 3-year statute of limitations from that moment (see sec. 6501(a)). In siding with the taxpayers, the Tenth Circuit stated (614 F.2d at 1266):

> The purpose of § 6501(c) is to provide the Government time to unearth information the taxpayer did not furnish and to file an assessment. Once the Government has the information * * * as said in *Bennett* [*v. Commissioner*, 30 T.C. 114, 123–124 (1958)], "there can be no policy in favor of permitting assessment thereafter at any time without limitation."

*Dowell* is both factually and legally distinguishable. In *Dowell*, two returns were filed for the same taxable year, the first, fraudulent, the second, nonfraudulent. Here, by contrast, only one return was filed for each taxable year and the question whether these returns were fraudulent is the contest-

ed issue which we must decide at trial. Additionally, *Dowell* and its progeny[3] are purely judicial interpretations of sections 6501(a) and 6501(c) in particular factual settings; they make no reference to the constitutional requirements of due process.

We need not decide in this case, however, whether the due process clause sets any outer limit to the time in which respondent must issue a deficiency notice asserting fraud after he possesses the information needed to issue such notice, since, in the instant case, petitioners have failed to demonstrate any actual prejudice resulting from the delay.

Petitioners contend that a delay by respondent in issuing a deficiency notice asserting civil fraud penalties is analogous to a delay by a prosecutor in bringing a criminal indictment. In *United States v. Lovasco*, 431 U.S. 783 (1977), and *United States v. Marion*, 404 U.S. 307 (1971), the Supreme Court noted that even though a statute of limitations may not have expired before a criminal indictment was brought, the due process clause could be invoked to suppress an indictment in cases of oppressive delay by the prosecutor. However, to be entitled to such due process relief, the Court made clear that, at a minimum, proof of actual prejudice to the defendant was necessary. *United States v. Lovasco, supra* at 790; *United States v. Marion, supra* at 324–325. Even if the preindictment due process rules of *Lovasco* and *Marion* were applicable to respondent in civil fraud cases, therefore, petitioners would be required to show actual prejudice from respondent's delay. This they have not done.

Petitioners claim that they have suffered actual prejudice by the fact that two witnesses they would have called to testify at trial died in the period between Dr. Riland's criminal acquittal and the mailing of the statutory notice in this case. The first witness, Rosamond Dohoney (Dr. Riland's administrative assistant/nurse) died, however, only 3 months after Dr.

[3]*Klemp v. Commissioner*, 77 T.C. 201 (1981), on appeal (9th Cir., Nov. 2, 1981); *Liroff v. Commissioner*, T.C. Memo. 1982–312; *Derfel v. Commissioner*, T.C. Memo. 1982–311; *Deleet Merchandising Corp. v. Commissioner*, T.C. Memo. 1982–310; *Liroff v. Commissioner*, T.C. Memo. 1982–309; *Kramer v. Commissioner*, T.C. Memo. 1982–308; *Nesmith v. Commissioner*, T.C. Memo. 1981–561, on appeal (5th Cir., Apr. 26, 1982); *Badaracco v. Commissioner*, T.C. Memo. 1981–404, on appeal (3d Cir., Nov. 6, 1981); *Deleet Merchandising Corp. v. United States*, 535 F. Supp. 402 (D. N.J. 1981); *Britton v. United States*, 532 F. Supp. 275 (D. Vt. 1981). See also *Espinoza v. Commissioner*, 78 T.C. 412 (1982).

Riland's criminal case concluded. Even if respondent had issued a notice of deficiency the very day the doctor was acquitted,[4] no trial would have occurred before this witness's death. Consequently, it can hardly be said that respondent's delay caused the unavailability of her testimony at a trial in this case. Cf. *Costello v. United States*, 365 U.S. 265, 283 (1961).

In addition, it is not at all clear how Dohoney's testimony would have benefited petitioners. Petitioners never called Dohoney to testify at Dr. Riland's criminal trial; nor did petitioners make any attempt to depose Dohoney, though they concede they knew she was very ill at the time of the criminal trial. Had petitioners thought Dohoney's testimony would be useful to them, ordinary prudence would have inclined them to avail themselves of the necessary procedures to preserve her testimony by deposition.

Petitioners' other proposed witness, Nelson A. Rockefeller, was to be called only as a character witness in the instant case. While his testimony might have been useful, it seems possible or even likely that petitioners can find other credible character witnesses to testify on Dr. Riland's behalf. Any prejudice suffered by petitioners as a result of the death of this witness we think was de minimis.

Any further prejudice petitioners claim from the simple passage of time and accompanying loss of witnesses' memories is not the sort of actual prejudice which entitles even a criminal defendant to due process clause relief. *United States v. Hendricks*, 661 F.2d 38, 40 (5th Cir. 1981); *United States v. Rogers*, 639 F.2d 438, 441 (8th Cir. 1981); *United States v. Muse*, 633 F.2d 1041, 1044 (2d Cir. 1980) (en banc).

Having failed to observe any actual prejudice from the delay, we need not embark on the further due process inquiry into respondent's reasons for the delay.[5]

Petitioners also cite several forfeiture cases as analogous

---

[4]Petitioners make no argument that a deficiency notice should have been issued herein at any time prior to that date.

[5]We do note, however, that there is no evidence to suggest respondent's delay was for the improper purpose of tactical advantage. *United States v. Marion*, 404 U.S. 307, 324 (1971). So far as the record reveals, the delay was a result of, first, petitioners' attempts to secure administrative review and settlement of the case and, after June 1977, respondent's review of the extensive files and legal arguments presented.

examples of the application of due process delay rules to Government agency action: *United States v. One Motor Yacht Named Mercury*, 527 F.2d 1112 (1st Cir. 1975); *States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146 (4th Cir. 1974); and *Sarkisian v. United States*, 472 F.2d 468 (10th Cir. 1973). These cases held that unnecessary Government delays ranging from 9 months to a little more than a year in instituting forfeiture proceedings after property had been seized violated due process. But actual prejudice in these cases is clear; the Government had already taken the disputed property, depriving the owner of possession during the period between the seizure and the proceedings. The Government had performed a clear taking of property, and due process required a hearing on that taking to be commenced promptly. See *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600 (1974); *Fuentes v. Shevin*, 407 U.S. 67 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969).

Petitioners' situation is quite distinguishable. The IRS here has not yet assessed the deficiencies and fraud additions. Petitioners throughout the period of delay have had complete possession and use of the money the Government now seeks. No taking has yet occurred and no monetary prejudice has been suffered on account of the delay. Under such circumstances, and absent any other showing of constitutionally cognizable prejudice, we hold that the due process clause does not provide petitioners with an avenue of relief to respondent's delay.[6]

Petitioners next ask us to invalidate the deficiency notice because it was the product of agency action unreasonably delayed in violation of the mandate of 5 U.S.C. sec. 555(b) (1976). That section provides, among other things, that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." Petitioners contend that under 5 U.S.C. sec. 706(1) (1976), which provides that "the reviewing

---

[6]We note that in a different context, the Supreme Court has held in the absence of a showing of prejudice that a 27-year delay between a citizen's false and fraudulent statements to obtain naturalization papers and the Government's institution of deportation hearings (which, like civil tax fraud proceedings, could be brought by statute at any time) was "not so unreasonable as to constitute a denial of due process." *Costello v. United States*, 365 U.S. 265, 284 (1961).

court shall—(1) compel agency action unlawfully withheld or unreasonably delayed," this Court is granted jurisdiction to invalidate respondent's statutory notice.

Notwithstanding petitioners' contentions on this point, we do not deem it necessary to explore the parameters of the Administrative Procedure Act (5 U.S.C. sec. 551 et seq.) (APA) in the context of the present case because, as already demonstrated, petitioners have not been prejudiced by any delay. Recent cases in other areas of the law indicate that to be entitled to *invalidate* (as opposed to compel) agency action unreasonably delayed, under 5 U.S.C. sec. 706(1), an interested party must also show prejudice. Compare *Equal Emp. Opportunity Com'n v. Liberty Loan Corp.*, 584 F.2d 853, 857 (8th Cir. 1978); *Chromcraft Corp. v. United States Equal Emp. Op. Com'n*, 465 F.2d 745, 747 (5th Cir. 1972), cases involving invalidation of agency action; with *Silverman v. N.L.R.B.*, 543 F.2d 428 (2d Cir. 1976); *Nader v. F.C.C.*, 520 F.2d 182, 206–207 (D.C. Cir. 1975), cases compelling agency action. Thus, even if we had jurisdiction under the APA, petitioners would not be entitled to set aside respondent's deficiency notice under 5 U.S.C. sec. 706(1).[7]

Finally, petitioners claim that the IRS violated several of its own procedures (as set out in the Internal Revenue Manual) in processing its case after Dr. Riland's criminal acquittal and that violation of these procedures constitutes a violation of petitioners' due process rights: First, petitioners claim that by delaying issuance of a statutory notice of deficiency, respondent violated Internal Revenue Manual (Audit) sec. 4565.8(5) which, until recently, provided: "Immediately upon receipt of such notification [of criminal acquittal] regarding cases in which collection has not been effected, the District Director will take appropriate action to secure assessment or collection, or both when necessary." Second, petitioners contend that respondent violated Internal Revenue Manual (Administration) sec. 9533(1), by not forwarding "a transcript of pertinent remarks and decision of the judge" to the individuals within

---

[7]In a different context, a Circuit Court has previously held that the Tax Court lacks jurisdiction under 5 U.S.C. sec. 706 to review the "record" of Internal Revenue Service actions at the administrative level in a tax case. *O'Dwyer v. Commissioner*, 266 F.2d 575, 580 (4th Cir. 1959), affg. 28 T.C. 698 (1957).

the IRS having jurisdiction over petitioners' postacquittal civil fraud case, as required by that section. Third, petitioners claim that respondent, by not obtaining either the Government's or petitioners' exhibits from the criminal trial for the IRS civil review process violated section 9536(1) of the Internal Revenue Manual.[8]

We have often said that absent substantial evidence of unconstitutional conduct on respondent's part which would impugn the integrity of this Court if he were allowed to benefit from it, we generally will not look behind a deficiency notice to examine respondent's motives or procedure leading to his determination. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974); *Human Engineering Institute v. Commissioner*, 61 T.C. 61, 66 (1973). "The underlying rationale for the foregoing is the fact that a trial before the Tax Court is a proceeding de novo." *Greenberg's Express, Inc. v. Commissioner, supra* at 328.

Petitioners attempt to avoid this well-established rule by contending that the IRS, as an agency, is bound by the procedures it adopts and its failure to follow its own procedures, as set out in the Internal Revenue Manual, is a per se violation of due process. But a recent Supreme Court case, *United States v. Caceres*, 440 U.S. 741 (1979), indicates that not all violations of an agency's internal procedures rise to the level of a constitutional violation.

In *Caceres*, the IRS had recorded a conversation between one of its agents and a defendant in violation of a provision of the Internal Revenue Manual. The defendant sought suppression of this evidence on due process grounds. Noting that the IRS rules were neither required by the Constitution nor any statute and that the defendant could not reasonably contend that he relied on the regulation or that its breach had any

---

[8]Internal Revenue Manual (Administration) sec. 9536(1) provides:

Information Affecting Civil Settlement

(1) Information which may have a substantial effect on the civil settlement of a case may be developed after a special agent's report has been submitted, possibly while assisting counsel in preparing for trial or during the trial for the criminal offense. Such information may consist of admissions of liability, or relate to the existence of additional records or witnesses which may have an important bearing on the determination of the civil liability. In this respect an effort will be made by the special agent to obtain copies of any exhibits introduced during the trial which contain information not uncovered during the investigation and which may have a significant bearing on the civil liability.

detrimental effect on his conduct, the Court declined to apply the exclusionary rule. Feeling that "a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures" (440 U.S. at 755–756), the Court said:

> In the long run, it is far better to have rules like those contained in the I.R.S. Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form. [440 U.S. at 756.]

Since the decision in *Caceres*,[9] several courts have held that the IRS's violation of its own postaudit review procedures does not rise to the level of a due process clause violation. *Foxman v. Renison*, 625 F.2d 429, 431–432 (2d Cir. 1980); *Kopunek v. Director of Internal Revenue*, 528 F. Supp. 134 (S.D. N.Y. 1981); *John Doe Corp. v. Miller*, 499 F. Supp. 378 (E.D. N.Y. 1980). Therefore, even assuming without deciding that in the instant case respondent violated the sections of the Internal Revenue Manual cited by petitioners, petitioners are entitled to no due process relief either by way of suppression or summary judgment.

### Spoliation and Destruction of Evidence

Petitioners cite three alleged instances of spoliation and/or destruction of evidence in the instant case. Each of these occurrences, they argue, requires us either to render summary

---

[9]Petitioners cite several Circuit Court cases involving violations of IRS procedures in the giving of *Miranda*-type warnings to potential criminal suspects—procedures possibly going "somewhat further than the Constitution requires." *United States v. Leahey*, 434 F.2d 7, 10 (1st Cir. 1970); *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1970); *United States v. Phifer*, 335 F. Supp. 724 (S.D. Tex. 1971); *United States v. Brod*, 324 F. Supp. 800 (S.D. Tex. 1971). In each of these cases, all criminal, the court found a due process violation warranting suppression.

These cases are factually distinguishable from the instant case. They were also all decided prior to *Caceres*. While they have not been specifically overruled, there exists grave doubt as to their continuing validity. See *United States v. Nuth*, 605 F.2d 229, 233–234 (6th Cir. 1979). Additionally, we have held that the failure to give such warnings will not require suppression in a subsequent civil fraud case even if suppression was required in a criminal case. *Brod v. Commissioner*, 65 T.C. 948 (1976) (Court reviewed). See also *Romanelli v. Commissioner*, 54 T.C. 1448 (1970) (Court reviewed), revd. 466 F.2d 872 (7th Cir. 1972); *Harper v. Commissioner*, 54 T.C. 1121 (1970) (Court reviewed).

judgment or to preclude respondent from offering proof concerning the subject matter of the spoliated or destroyed evidence.

First, and most troublesome, petitioners cite the destruction by Special Agent Connor of handwritten interview notes taken by him during the course of his investigation of Dr. Riland. These notes related to interviews of Dr. Riland and other individuals. It was Connor's practice to destroy such notes after they were carefully incorporated into more formal memoranda. At Dr. Riland's criminal trial, Connor stated that the notes were generally destroyed because after they were used to prepare a typewritten memorandum, they served no purpose and merely took up extra space. Connor also testified, however, that another reason for his destroying the notes was to prevent witness impeachment should a defense attorney uncover any inconsistencies between those notes and a witness' testimony at trial.

The destruction of interview notes after incorporating those notes into typed memoranda was standard IRS procedure prior to 1977. This practice was ended that year in response to the holdings in *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976), and *United States v. Harrison*, 524 F.2d 421 (D.C. Cir. 1975). *Harris* and *Harrison* held that rough notes of interviews of third parties taken by FBI agents conducting criminal investigations were potentially discoverable by criminal defendants under the doctrine of *Brady v. Maryland*, 373 U.S. 83 (1963), and hence must be preserved. In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. at 87.)

We have previously held that the formal memoranda of interviews conducted by IRS agents of taxpayers are discoverable under Rule 70(c) as statements of a party because of "The extreme care taken by the agents to assure the accuracy and completeness of the memoranda." *Phelps v. Commissioner*, 62 T.C. 513, 517 (1974). We have also held that memoranda of IRS interviews of nonparty witnesses are discoverable by the taxpayer under Rules 70(b) and 72, even without a showing of good cause. *Barger v. Commissioner*, 65 T.C. 925, 926–927

(1976); *Morris v. Commissioner*, 65 T.C. 324 (1975); *P. T. & L. Construction Co. v. Commissioner*, 63 T.C. 404, 412–413 (1974). There is here, thus, no dispute that the formal memoranda of Connor's interviews are discoverable by petitioners; so far as the record reveals, all such formal memoranda have been produced.

The question with which we are presented is, therefore: Does the destruction by respondent's agents of the informal notes of these interviews in itself constitute a denial of petitioners' due process rights in a civil tax proceeding? We think not. First, there is no evidence here that the destruction of the notes was done in bad faith. Prior to our holdings in *P. T. & L. Construction Co. v. Commissioner, supra,* and *Phelps v. Commissioner, supra,* it was respondent's position that neither the notes nor the formal memoranda of agent interviews were discoverable, in part because they might be used for purposes of witness impeachment. See *Industrial Electric Sales & Service, Inc. v. Commissioner*, 65 T.C. 844, 846 (1976); *P. T. & L. Construction Co. v. Commissioner, supra* at 412. That Connor may have destroyed the notes in part because he viewed their only purpose as impeachment does not show that Connor destroyed the notes to hide evidence or evidentiary leads from petitioners. To the contrary, Connor carefully attempted to incorporate the interview notes into memoranda which he did preserve. Thus, he tried to preserve substantive evidence and evidentiary leads originating in the interviews.[10]

Second, even assuming without deciding that the destruction of the notes in this civil case should be measured against the due process standards applied in criminal cases, petitioners' due process rights have not been violated. In *United States v. Terrell*, 474 F.2d 872, 877 (2d Cir. 1973), and again in *United States v. Anzalone*, 555 F.2d 317, 321 (2d Cir. 1977), the Second Circuit, to which this case is appealable, held that while the

---

[10]We also observe the note to Rule 70(b) which states, in part:

"With respect to discovery of an opponent's materials which may be used for impeachment purposes, the same Advisory Committee observed (House Doc. No. 91–291, *supra*, pp. 25–26) that 'the courts have in appropriate circumstances protected materials that are primarily of an impeaching character.' * * * [60 T.C. 1098 (1973).]"

See also *Industrial Electric Sales & Service, Inc. v. Commissioner*, 65 T.C. 844 (1976) (impeachment potential of third-party statements protected against by ordering their disclosure only after petitioners responded to respondent's request for admissions).

FBI would be "well-advised" to retain handwritten interview notes in the future, the destruction of such notes was not a violation of the defendant's rights absent some showing by the defense that the notes were destroyed on the eve of trial and were substantially different in content from the formal memoranda. See also *United States v. Grammatikos*, 633 F.2d 1013, 1021–1022 (2d Cir. 1980) (noting that *Terrell* reflects the position of a majority of the circuits). In our case, petitioners have not shown that Connor's memoranda differed materially from his rough notes.[11] Also, the notes were not destroyed on the eve of trial, but during the time of the investigation when a decision to prosecute or issue a deficiency notice had not as yet been made. See *United States v. Grammatikos, supra* at 1021. Under these circumstances, petitioners have failed to show prejudice by the destruction of the notes and would not be entitled to due process relief even if this were a criminal case.

Petitioners cite two more instances of spoliation and/or destruction of evidence: (1) The reworking of Agent Ringel's draft report concerning the May 25, 1971, interview of Dr. Riland, and (2) the unexplained failure of the typed stenographic record of the May 24, 1972, interview with Weiner to include a sentence contained in the stenographer's notes.

In regard to Agent Ringel's report, petitioners particularly complain that the wording of the report was in part determined by individuals who were not present at Dr. Riland's interview—namely, Connor and Bernard Singer. We fail to see how petitioners have been prejudiced by these successive editings, however: Each version is now in petitioners' possession and may be used for purposes of impeachment of Ringel should he testify as to the events of May 25, 1971. Additionally, the successive drafts do not differ materially from one another except perhaps in regard to Dr. Riland's alleged "arrest me" statement. At the criminal trial, though, Ringel testified that the "arrest me" quote was actually not a confession by Dr. Riland, but rather in the nature of an inquiry: "Well, what are you going to do now, arrest me?" We

---

[11]We recognize this would be a difficult showing to make in the absence of Connor's notes, but there are other ways to demonstrate Connor's inadequate transcription techniques—e.g., affidavits of third-party witnesses stating that Connor's formal memoranda misquoted his notes. See *United States v. Terrell*, 474 F.2d 872, 877 n. 3 (2d Cir. 1973).

find insufficient reason to impose sanctions as a result of this asserted spoliation.

With respect to the stenographer's omission, similarly petitioners have suffered no prejudice since they have the original notes. There is nothing in the record to suggest that the omission was anything but accidental, especially since it was done by a third party who no doubt knew little of the significance of Weiner's statements in the context of the overall investigation. We decline to infer any evil motives and again decline to impose punitive sanctions on respondent.

Taken singly or viewed together, we see no evidence of a pattern of IRS misbehavior in these several instances of alleged spoliation or destruction of evidence.

### The Weiner "Conspiracy"

Petitioners' final argument is that the IRS, after threatening Weiner with criminal prosecution (i.e., reading him *Miranda*-type warnings), employed Weiner as a "mole" to discover and turn over petitioners' records for many years, including years for which Weiner was not authorized to represent petitioners. All the while during this alleged conspiracy, Weiner, say petitioners, assured Dr. Riland that the latter did not need to worry about criminal prosecution and did not need to hire a lawyer.

Petitioners contend these actions by respondent and Weiner (1) violated Dr. Riland's right to counsel under the Sixth Amendment, (2) violated due process (Fifth Amendment) because they shock the conscience,[12] and (3) constituted unreasonable searches and seizures in violation of petitioners' Fourth Amendment rights. As a remedy for the alleged violation of these three amendments, petitioners seek either summary judgment or suppression of the various documents and records Weiner turned over to the IRS.

Initially, we note that petitioners do not contend that their Fifth Amendment rights against self-incrimination have been violated by Weiner and the IRS—particularly by the IRS's alleged failure to repeat *Miranda*-type warnings at the begin-

---

[12]See *Lego v. Twomey*, 404 U.S. 477, 485–486 (1972); *Jackson v. Denno*, 378 U.S. 368, 385–386 (1964); *Rochin v. California*, 342 U.S. 165, 169–174 (1952); *Proesel v. Commissioner*, 73 T.C. 600, 607 (1979).

ning of some of its talks with Dr. Riland. In any event, our prior opinions have established that petitioners, facing no real prospect of criminal prosecution either for the years involved in the criminal fraud trial or for the earlier years at issue herein, may not suppress their own statements and papers on that ground in this civil proceeding, even if these things were originally unconstitutionally obtained. *Brod v. Commissioner*, 65 T.C. 948 (1976) (Court reviewed); *Romanelli v. Commissioner*, 54 T.C. 1448 (1970) (Court reviewed), revd. 466 F.2d 872 (7th Cir. 1972); *Harper v. Commissioner*, 54 T.C. 1121 (1970) (Court reviewed).

Secondly, no violation of petitioners' rights to counsel under the Sixth Amendment may be raised as a ground to suppress petitioners' statements obtained in violation thereof. *Harper v. Commissioner, supra* at 1137. The Sixth Amendment is generally not applicable in civil tax proceedings. *Cupp v. Commissioner*, 65 T.C. 68, 85–86 (1975), affd. 559 F.2d 1207 (3d Cir. 1977).

There remains, however, the question whether certain items turned over by Weiner to the IRS were obtained in violation of the Fourth Amendment and due process. Petitioners argue that Weiner, in these instances, acted outside the scope of his authority and in fear of his own criminal prosecution as return preparer. Respondent, on the other hand, contends that Weiner's actions were within the scope of his authority, that Weiner did not fear criminal prosecution and that, in any case, Dr. Riland's subsequent co-operation with respondent's investigation constituted an implied ratification of Weiner's actions.

Petitioners' request for summary judgment as a sanction for alleged Fourth and Fifth Amendment violations must be denied. Even in instances where we have discovered such unconstitutional conduct underlying a deficiency notice, we have refused to declare the deficiency notice itself null and void as a sanction for respondent's behavior. See *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 328 (1974); *Suarez v. Commissioner*, 58 T.C. 792, 814 (1972).

In regard to petitioners' request for suppression of evidence as a sanction, we note that, to date, it is still an open question in this Court whether the exclusionary rule may be applied in a civil tax proceeding as a remedy for IRS or intrasovereign

violations of the Fourth Amendment. See *United States v. Janis,* 428 U.S. 433, 456 (1976); *Black Forge, Inc. v. Commissioner,* 78 T.C. 1004 (1982); *Guzzetta v. Commissioner,* 78 T.C. 173, 175 n. 2 (1982); *Tirado v. Commissioner,* 74 T.C. 14, 29 (1980); *Proesel v. Commissioner,* 73 T.C. 600, 610 (1979).

It is unclear merely from the documents submitted by the parties whether there actually were violations of petitioners' Fourth or Fifth Amendment rights in the instant case which in a criminal trial would warrant suppression. In particular, there appear to be genuine issues as to material facts concerning both Weiner's motives and intentions and the alleged knowing ratification of Weiner's actions by Dr. Riland.

We think petitioners are entitled to an evidentiary hearing on these contested matters at the beginning of the trial of this case. Should petitioners prove that respondent's actions in fact violated the Fourth Amendment and due process in a way that would have entitled petitioners to suppression of evidence in a criminal trial, we no doubt will have to face the open question concerning the exclusionary rule we have not previously decided. See *Black Forge, Inc. v. Commissioner, supra*; *Guzzetta v. Commissioner, supra.* Until that time, however, we express no opinion on the subject.

*An appropriate order will be entered.*