JAMES KENNETH JONES AND GRACE A. JONES, ET AL., [1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4609-87,      Filed July 3, 1991.
4610-87,
31664-87.

---

[1]These cases involve deficiencies relating to James and Grace Jones, jointly, at docket No. 4609-87; James Jones, separately, at docket No. 4610-87; and Ken's Audio Specialties & Sewing Center, Inc., a related business entity, at docket No. 31664-87. Respondent sought to consolidate them for all purposes and petitioners objected. Petitioners, however, were agreeable to consolidation for purposes of this pretrial motion. Accordingly, respondent's motion to consolidate for purposes of briefing and opinion has been granted for purposes of disposing of petitioners' motion without prejudice to respondent to renew his motion to consolidate for purposes of trial, if necessary or appropriate.

*David D. Aughtry* and *J. René Hawkins, Jr.*, for petitioners James Kenneth Jones, and Ken's Audio Specialties & Sewing Center, Inc.

*John E. James* and *Kathryn Weigand,* for petitioner Grace A. Jones.

*Eric B. Jorgensen,* for the respondent.

GERBER, *Judge:* Petitioners have moved to suppress evidence allegedly obtained by respondent through trickery, deceit, and misrepresentation. Petitioners contend that respondent's agents improperly obtained information to be used in a criminal prosecution under the guise of a civil examination. Essentially, petitioners contend: (1) That respondent's criminal investigators, during a preliminary inquiry, developed sufficient information from which a full-scale investigation could have been commenced; (2) that instead, the matter was referred to a revenue agent ostensibly for civil examination but with the actual intent of obtaining more information from petitioners, for the purpose of criminal prosecution; (3) that respondent's criminal and civil agents collaborated in obtaining criminal prosecution information through the civil examination process; and (4) finally, that petitioners cooperated and were unaware of the true intent of respondent's agents and turned over records and information which would not have been provided if they had known it was a criminal investigation. Petitioners assert that such conduct constitutes an illegal search and seizure violating their constitutional rights, and they ask us to sanction respondent by excluding all illegally obtained evidence and/or shifting the burden of going forward with the evidence to him on all matters. Based upon the notices of deficiency and without considering petitioners' request for sanctions on respondent, respondent would bear the burden of proof only with respect to the addition to tax for fraud under sec. 6653(b).[2]

This matter was the subject of a lengthy trial, substantial briefs, and a large volume of requested findings of fact. We decide, as a matter of law, that even if all of petitioners' requested findings were adopted and a Fourth or Fifth

---

[2]Section references are to the Internal Revenue Code of 1954 as amended and in effect for the periods at issue.

Amendment violation did occur, in the setting of this case we will not employ the exclusionary rule. Background facts are provided in order to explain our denial of petitioners' motion.

Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows:

*James Kenneth and Grace A. Jones*      *Docket No. 4609-87*

| | | Additions to tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)[3] | Sec. 6653(b)(2) | Sec. 6661 |
| 1980 | $105,799.19 | $52,899.60 | - - - | - - - |
| 1981 | 84,496.83 | 42,248.42 | - - - | - - - |
| 1982 | 126,088.90 | 63,044.45 | applies | $31,522.23 |
| 1983 | 67,755.17 | 33,877.59 | applies | 16,938.79 |

*James K. Jones*      *Docket No. 4610-87*

| | | Additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6654 | Sec. 6661 |
| 1984 | $48,514.72 | $24,257.36 | applies | $2,739.59 | $12,128.68 |
| 1985 | 89,420.07 | 44,710.33 | applies | 4,170.63 | 22,355.02 |

*Ken's Audio Specialties & Sewing Center, Inc.*      *Docket No. 31664-87*

| | | Additions to tax | | |
|---|---|---|---|---|
| Year ended | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 4/30/83 | $109,233 | $54,617 | applies | $27,308 |
| 4/30/84 | 66,580 | 33,290 | applies | 16,645 |

## Background

Petitioners James Kenneth Jones and Grace A. Jones were husband and wife during the years at issue, but were divorced at the time of the hearing on petitioners' motion to suppress. At the time their petitions were filed, the legal residence of Mr. and Mrs. Jones was Macon, Georgia. Unless otherwise noted, "petitioners" in the plural refers to James Kenneth and Grace A. Jones and "Jones" in the singular refers to James Kenneth Jones. For the taxable years 1980, 1981, 1982, and 1983, petitioners filed joint Federal individual income tax returns using the cash method of accounting. Jones did not file Federal income tax returns for 1984 and 1985.

---

[3]Sec. 6653(b) is applicable for the 1980 and 1981 taxable years. Sec. 6653(b)(1) and (2) is applicable for the 1982 and 1983 taxable years.

Petitioner Ken's Audio Specialties & Sewing Center, Inc. (hereinafter referred to as Ken's Audio or the company), a Georgia corporation, had its principal place of business in Macon, Georgia, at the time its petition was filed. Ken's Audio was incorporated by Jones on May 5, 1978, to conduct a retail electronics business under the name Ken's Stereo Junction. During November 1980, Jones expanded his business and built a stereo and video specialty store in Macon, Georgia. During August 1984, he opened a second store in Warner Robins, Georgia. Both stores specialized in the business of selling, servicing, and installing electronic goods, such as automobile stereo radio systems, video cassette recorders, and stereo equipment, including turntables, stereo receivers, speakers, and tape recorders. Jones was president of Ken's Audio. Petitioners owned 90 percent of the stock of Ken's Audio, and Jones' brother owned the remaining 10 percent of the stock.

Ken's Audio filed small business corporation income tax returns, Forms 1120-S, reporting income and deductions by means of the accrual method of accounting for its taxable years ended April 30, 1981, and April 30, 1982. For its taxable years ended April 30, 1983, and April 30, 1984, Ken's Audio filed Federal corporate income tax returns, Forms 1120, reporting under the accrual method of accounting.

For the taxable years 1979, 1980, 1981, and 1982, petitioners operated a partnership known as ABC Day Care Center which provided day care services for children in petitioners' residence.

### The Criminal Investigation Information Item

On or about August 16, 1983, Special Agent Gary W. Schwab (Schwab or Special Agent Schwab), Criminal Investigation Division (CID), Internal Revenue Service (IRS), Macon, Georgia, discovered a newspaper article concerning petitioners' new home, Woodcrest Manor. The story and pictures portrayed a large and lavish home consisting of 6,000 square feet of living space and a 1,000-square-foot bedroom on three levels with a jacuzzi on the center level. Schwab also learned that Mrs. Jones had told an interior decorator, who was also Schwab's neighbor, that petitioners

paid for the new house with savings from the day care center Mrs. Jones had operated in their old home. Schwab prepared an "information item"[4] and he and Special Agent Cathy Cunard (Cunard or Special Agent Cunard) were assigned to evaluate the case for its "criminal potential."

Corporate, partnership, and individual income tax returns for the 5-year period 1979 through 1983 were sought in order to consider whether the expenditures for the home were in line with the income reported. All returns were internally available, except that the corporate Federal income tax returns of Ken's Audio could not be located due to an error in the corporate taxpayer identification number. Schwab sent Jones a form letter requesting information about the returns for Ken's Audio, and Jones responded with a copy of a corporate Federal tax deposit form that contained the pertinent information (the correct taxpayer identification number) on Ken's Audio. Special Agent Schwab had no personal contact or other communications with petitioners until April 1986. At this juncture, petitioners believed that the contact by IRS had been successfully concluded.

After examination of the returns, Special Agent Schwab concluded that petitioners could not afford Woodcrest Manor based upon their reported income. Special Agent Schwab did not find any indication of nontaxable sources of income which accounted for the difference, such as loans from Ken's Audio. The corporate returns did not reflect shareholder loans outstanding, with the exception of the year ending April 30, 1981, which reflected a $541 beginning balance and $0 (no loans) ending balance.

Special Agents Schwab and Cunard also checked public records and found several contemporaneous land purchases and that certain relatively large mortgages had been paid over a short period of time. Information was also received from a local law enforcement official about Jones' purchases of furnishings for his new home with checks drawn on Ken's

---

[4]An information item is a preliminary investigation. Special agents are limited in the types of inquiries they can make in evaluating the information item. Internal Revenue Manual sec. 9311.3(2) permits inquiries about returns filed and scrutiny of public records. Also, a taxpayer can be contacted by mail to verify his or her filing record utilizing Letter 1509(DO). Special agents cannot personally contact the taxpayer while evaluating an information item or issue summonses to third parties for records.

Audio's checking account and that Jones purchased a 1984 Mercedes 380 SEL automobile for cash.

Additionally, petitioners' former certified public accountant and tax return preparer, J. Everett Flournoy, volunteered[5] that Jones had no sales receipts or records to back up his figures. On one occasion Jones told him to use $25,000 as his monthly sales with no backup documents. As a result of Jones' practices Flournoy stopped preparing returns for him. Flournoy could not understand how Jones could continually report losses on his business and his wife's day care center and still maintain such a high standard of living. Flournoy also volunteered that Jones had not received any inheritances that would allow him to make the asset acquisitions that he had made in recent years.

Special Agent Cunard prepared a preliminary source and application of funds analysis with respect to petitioners' 1979 through 1983 taxable years which indicated that petitioners may have had unreported income in 1980, 1981, and 1983 in the respective amounts of $42,271, $201,108, and $52,983. It also indicated that petitioners' reported income for 1979 and 1982 exceeded the amount determined under the source and application of funds method in the respective amounts of $5,914 and $32,744.

### Referral by CID to Civil Examination Division

Special Agents Schwab and Cunard recommended that the matter be referred to the examination division for a civil examination under the controlled referral program.[6] This referral concluded that the Jones case was lacking in criminal potential. The controlled referral materials contained sufficient evidence and/or information so that a full-scale criminal investigation could have been recommended against Jones and his corporations.

---

[5]The parties acknowledge that it is unusual for the IRS to obtain a voluntary statement from a taxpayer's certified public accountant because it is especially effective evidence that can be used against the taxpayer. It is also noted that Mr. Flournoy was not contacted by Schwab or Cunard in connection with the preliminary investigation of petitioners, but in connection with another, apparently unrelated, taxpayer.

[6]This program involves cases which originate in CID and do not possess criminal potential, but which may have civil tax potential. The controlled referral program is operated under a policy consideration which anticipates that the examination division may refer the case back to CID when and if the civil examiner believes there is a firm indication of fraud.

In consideration of taxpayers' constitutional rights, the IRS recognizes that a criminal investigation should not be conducted under the guise of a civil examination. Internal Revenue Manual section 9311.83(1) contains the following statement:

The Tweel case (*U.S. v. Tweel,* 55[0] F.2d 297 (5th Cir. 1977)) very clearly points out that the Service should not attempt to use a civil investigation to develop a criminal tax case. If a criminal case is being developed with regard to a taxpayer, the Service must respect the taxpayer's rights and follow Manual instructions pertaining thereto. Therefore, under no circumstances will these procedures be used to develop a criminal tax case under the guise of a civil examination.

When Special Agent Schwab recommended that petitioners' case be referred to the examination division, it had been the biggest unreported income case of his career which did not involve narcotics. The controlled referral package was assigned to Revenue Agent Bonnie Waldrep (Waldrep or Revenue Agent Waldrep) in late December 1984. Prior to that time, Waldrep and Special Agent Cunard had worked together for approximately 3 years when Cunard was a revenue agent with the examination group in Macon. During that period, Waldrep and Cunard were friends who went to lunch and took breaks together. The Macon office for IRS was a small one containing only one group of about eight people each for collection, civil examination, and criminal investigation. There was substantial potential for IRS employees to see each other during a working day, or during breaks or lunch.

Up to this point petitioners were aware of Schwab's inquiry concerning the filing of corporate returns; had not sought to hire or involve a lawyer; had routinely referred the matter to their accountant; were not aware that special agents were interested in or had considered their individual income tax returns; had not been advised of their rights; and were not aware of any indication that their tax matters (either individual or corporate) had been or were being subjected to criminal investigation by the IRS.

On or about March 1, 1985, Waldrep advised petitioners by letter that their 1983 return would be examined. No mention was made of the 1979 through 1982 taxable years which were also referred from Schwab and Cunard. At the

time of this contact the period for assessment was about to expire with respect to the 1981 taxable year, but Waldrep did not seek to obtain an extension of the normal 3-year assessment period. Waldrep worked with petitioners' accountant, William S. Lamb. Lamb was cooperative because Waldrep held herself out to be a revenue agent conducting a civil audit. Lamb made it a practice, without exception, not to represent taxpayers under criminal investigation—it would be his practice to refer such matters to a lawyer.

Waldrep obtained petitioners' bank records and prepared a bank deposit analysis of unexplained deposits/unreported income and she concluded that unexplained deposits exceeded the income reported on petitioners' 1983 return by approximately $90,000. Lamb prepared a separate bank deposit analysis regarding petitioners' 1983 taxable year which he shared with Waldrep. Lamb's analysis also indicated that petitioners had substantial unexplained deposits approximating $100,000.

During various interviews, Waldrep obtained a number of admissions from Jones. Waldrep solicited the statement or admission that the corporation had paid Jones' loan on the building where Ken's Audio was located in the amount of $225,000. Waldrep considered the repayment of the $225,000 loan as additional income in 1980 and 1981. Jones also told Waldrep that Ken's Audio had purchased and claimed deductions concerning a Mercedes which was being used by petitioners for personal purposes. Additionally, substantial documentation was obtained by Waldrep from the Joneses and their representatives.

Jones also told Waldrep what has been referred to as the "cold cash story." After Jones had been advised by Lamb that his bank deposit analysis indicated unexplained deposits of approximately $100,000 and that Jones would have to reveal the source of these deposits to Waldrep, Jones told Waldrep that he maintained a cash hoard in the amount of approximately $100,000 in the freezer at their old home and this amount was used to fund new home construction. Jones also stated that the 1983 deposit items represented cash deposits.

On May 17, 1985, Lamb notified Waldrep that he was withdrawing from petitioners' case and that J. René

Hawkins, Jr., a lawyer from Macon, Georgia, would be handling the case. After being told that petitioners had engaged a lawyer, Revenue Agent Waldrep took the opportunity to ask the accountant a series of questions about Jones' level of personal knowledge regarding matters involved in the audit. Waldrep asked about Jones' personal participation in maintaining the books and records and whether Lamb had specifically informed Jones of his responsibility regarding maintaining the books and records, including the manner in which Jones was to record income and expenses. Lamb was also asked if Jones knew the difference between an expense and a capital expenditure. Waldrep made notes to the effect that Lamb stated that he was sure Jones did. Lamb also advised Waldrep that Jones had been keeping the books and records of the company when Lamb first became petitioners' accountant.

On May 20, 1985, Revenue Agent Waldrep went to Hawkins' law office and was presented with powers of attorney, Forms 2848, for petitioners personally and one, executed by Jones, for Ken's Audio. Waldrep noticed a typographical error on petitioners' individual power of attorney form and pointed it out to Hawkins. The tax, on the form, was incorrectly identified as "1040 corporate" rather than "1040 individual." Hawkins left the conference room with the form and soon returned with it corrected. Thereafter, Hawkins left Waldrep in Hawkins' conference room to review records. Waldrep proceeded to call Jones without first informing Hawkins. Jones was led to believe that his lawyer was sitting in the room with Waldrep during the call and he answered questions regarding purchase invoices from Ken's Audio's suppliers, whether they were 1983 accounts payable, whether he kept a detailed inventory, and various other questions about expenditures. Jones also admitted that personal expenses were paid out of the corporate checking account. After the call with Waldrep, Jones telephoned his attorney and expressed his anger and concern about being questioned by Waldrep and why attorney Hawkins permitted Waldrep to ask so many questions. Attorney Hawkins advised that he was unaware of the telephone conversation and he eventually expressed his displeasure to Waldrep about the improper contact with

his client. Waldrep, although admitting that she knew that the corporate power of attorney was proper, contended that the individual power of attorney was faulty.

Thereafter, matters deteriorated and Waldrep insisted on direct communication with petitioners, which request was denied by Hawkins. Waldrep then advised that the case would be referred for criminal purposes.

### *Referral by Civil Examiner Back to Criminal Investigation Division*

On February 25, 1986, Waldrep prepared two fraud referral reports for CID regarding her examination of petitioners and Ken's Audio: one criminal fraud referral for petitioners' 1980, 1981, 1982, and 1983 tax years; and one criminal fraud referral for the company's taxable years ended April 30, 1983, and April 30, 1984. A substantial portion of the evidence identified by Waldrep as support for the fraud referrals was first acquired or identified in some respect by Special Agents Schwab and Cunard during their evaluation of the information item. Information available to Schwab and Cunard which had not been provided to Waldrep appeared in Waldrep's report even though respondent's agents denied any communication between criminal and civil agents concerning this case prior to Waldrep's referral back to CID.

On October 6, 1987, a special agent's report recommending prosecution of Jones was submitted by Special Agents Schwab and Cunard. Schwab's recommendation was approved and criminal prosecution began. On April 14, 1988, as a result of a plea agreement, Jones waived indictment and pleaded guilty to an Information charging him with two counts of violating sec. 7206(1): One for making a false and fraudulent individual income tax return for 1981; and one for making a false and fraudulent corporate income tax return for the taxable year ended April 30, 1983. On May 26, 1988, the U.S. District Court entered judgment against Jones based on the guilty plea and sentenced him to 3 years in prison and a $25,000 fine.

As a result of the criminal investigation and civil examination, respondent issued various notices of deficiency. On December 12, 1986, respondent mailed a notice

of deficiency to petitioners for their taxable years 1980 through 1983. Also on December 12, 1986, respondent mailed a notice of deficiency to Jones for his taxable years 1984 and 1985. On July 10, 1987, respondent mailed a notice of deficiency to Ken's Audio for its taxable years ended April 30, 1983, and April 30, 1984.

## OPINION

In a pretrial setting, we consider whether this Court should employ the exclusionary rule if respondent's agents, as petitioners allege, acquired evidence through trickery, deceit, and misrepresentation in violation of rights guaranteed to petitioners under the Fourth, Fifth, or Sixth Amendments[7] to the United States Constitution.

### In General

It has long been recognized that this Court has authority to inquire into the question of the admissibility of evidence. In *Kluger v. Commissioner*, 83 T.C. 309, 316 (1984), we stated,

determinations regarding the admissibility of evidence in proceedings before this Court are an inherent power incident to this Court's duty to redetermine proposed income tax deficiencies. The fact that a determination of admissibility of evidence involves an inquiry into the propriety of actions of other courts, or other branches of Government, has never been thought to deprive this or any other Federal court of the authority to exercise that power * * *

This authority also allows us to determine whether to receive evidence (which, otherwise, may be admissible) obtained by the Government illegally. *Vallone v. Commissioner*, 88 T.C. 794, 806-816 (1987).

---

[7]Petitioners moved to suppress based upon the Fourth, Fifth, and Sixth Amendments. As to the Sixth Amendment, no argument or discussion was presented by the parties. Concerning the Fourth and Fifth Amendment questions, it would be necessary to consider them in more detail if we decided that the exclusionary rule is applicable in the setting of this case. We have focused upon the Fourth Amendment, much as the parties have, to develop our rationale supporting our decision.

Petitioners' argument is based upon the premise that they would not have cooperated if they had known that respondent was actually conducting a criminal investigation rather than a civil examination. Accordingly, the general focus of the inquiry is whether the alleged misrepresentations vitiate any consent to a search and seizure or waiver of the right against self-incrimination.

Normally, we will not look behind a deficiency notice to examine the evidence used as the basis for the Commissioner's determination, the propriety of his motives, or the administrative policies or procedures in making his determinations reflected in the notice. *Vallone v. Commissioner, supra; Jackson v. Commissioner,* 73 T.C. 394, 400 (1979); *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324, 327 (1974); *Human Engineering Institute v. Commissioner,* 61 T.C. 61, 66 (1973). The rationale for this rule is that a trial before this Court is a proceeding de novo; hence our determination of a taxpayer's liability must be based on the merits of the case and not on any previous record developed at the administrative level. *Jackson v. Commissioner, supra; Greenberg's Express, Inc. v. Commissioner, supra* at 328. The purpose of a proceeding before this Court is to determine a taxpayer's correct tax liability.

We have recognized an exception to this general rule in situations where there is substantial evidence of unconstitutional conduct on respondent's part. *Graham v. Commissioner,* 82 T.C. 299, 308-309 (1984), and cases cited therein, affd. 770 F.2d 381 (3d Cir. 1985); *Vallone v. Commissioner, supra* at 806 n.11.

### The Exclusionary Rule—Generally

Courts, in civil litigation settings, have applied the exclusionary rule to suppress illegally obtained evidence. See *Suarez v. Commissioner,* 58 T.C. 792 (1972) (*Suarez* was overruled in *Guzzetta v. Commissioner,* 78 T.C. 173 (1982), to the extent that it was inconsistent with *United States v. Janis,* 428 U.S. 433 (1976)); *Vander Linden v. United States,* 502 F. Supp. 693 (S.D. Iowa 1980); *United States v. Blank,* 261 F. Supp. 180 (N.D. Ohio 1966). We have questioned whether this Court may apply the exclusionary rule in our civil tax proceedings. See *Riland v. Commissioner,* 79 T.C. 185, 207 (1982). Even though we expressed reservations about the application of the rule in 1982, we have considered motions to suppress under the exclusionary rule. See, e.g., *Vallone v. Commissioner, supra* at 806-815; *Houser v. Commissioner,* 96 T.C. 184 (1991). Although we have had the occasion to consider such motions, none have been

granted to exclude evidence for constitutional rights violations.

The exclusionary rule is a judicially created remedy which has been applied in situations where evidence is derived directly or indirectly from a violation of the Fourth, Fifth, or Sixth Amendments. *Nix v. Williams,* 467 U.S. 431 (1984); *Kluger v. Commissioner,* 91 T.C. at 980. The exclusionary rule does not involve a question of the admissibility of evidence. Evidence which is otherwise admissible may be suppressed as a sanction in connection with the violation of constitutional rights. The exclusion or suppression of evidence is not mandated by the Fourth Amendment, but is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra,* 414 U.S. 338, 348 (1974); *United States v. Leon,* 468 U.S. 897, 906 (1984).

### The Exclusionary Rule—Development of Supreme Court Case Law

Prior to considering whether any violation in the setting of this or any civil case would warrant use of the exclusionary rule, we should consider the progressive status of the exclusionary rule. The exclusionary rule sanction applies only where a Fourth Amendment violation is substantial and deliberate. *United States v. Leon, supra* at 909; *Franks v. Delaware,* 438 U.S. 154, 171 (1978). Although earlier cases appear to imply that the exclusionary rule is a necessary corollary of the Fourth Amendment (see, e.g., *Mapp v. Ohio,* 367 U.S. 643, 651, 655-657 (1961)), later cases impose the exclusionary rule only where there exists a general deterrent effect by employing the rule. *United States v. Janis, supra; United States v. Leon, supra.*

The Supreme Court in *United States v. Janis,* 428 U.S. at 447-461, discussed various aspects of the exclusionary rule. Although the Supreme Court had "never * * * applied it to exclude evidence from a civil proceeding," such a result has not been precluded. 428 U.S. at 447. The Supreme Court has expressed some doubt concerning whether the exclusionary rule is effective in general and the Court has noted the absence of empirical evidence showing the effectiveness of

the exclusionary rule. Application of the exclusionary rule has been preceded by a balancing of various factors. The "cost on the societal interest in law enforcement by [the exclusionary rule's] proscription of what concededly is relevant evidence" must be weighed and considered in the process. 428 U.S. at 448-449. On the other hand, the Court has considered the potential for deterrence of future constitutional violations. In considering whether to employ the rule, the primary purpose or focus was the rule's potential for future deterrence. Accordingly, the institutions or individuals who may be sanctioned were identified and the effect of sanction considered. The element of the remoteness between the use of the rule and those who may have violated rights played an important role in the Court's evaluation. In the final analysis, the *Janis* court refused to apply the exclusionary rule in that case because the evidence, although seized in violation of the constitutional rights of an individual, was seized by the enforcement officers of a sovereign different from the one seeking to use the evidence in a civil proceeding.

Four years after *Janis*, the Supreme Court decided that the exclusionary rule applied only to violations involving the "defendant's own constitutional rights." *United States v. Payner*, 447 U.S. 727, 731 (1980). In that case, Federal officers deliberately and in an egregious manner violated the Fourth Amendment rights of an individual other than the defendant, who was the subject of the prosecution in a Federal criminal case. The Supreme Court allowed the Government's use of the illegally seized evidence and found the exclusionary rule inapplicable because the party whose rights were violated was not before the trial court. In discussing the District Court's decision to employ the exclusionary rule with respect to an individual who was not a party, the Supreme Court commented on the District Court's supervisory power, as follows:

Were we to accept this use of the supervisory power, we would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing. We hold that the supervisory power does not extend so far. [*United States v. Payner*, 447 U.S. at 737.]

Some 8 years after *Janis*, in *United States v. Leon, supra*, the use of the exclusionary rule was further restricted in an

intrasovereign setting where the Supreme Court decided that the seizing officers acted in good faith upon a facially valid search warrant. The search warrant was ultimately found to be invalid and the search in violation of Fourth Amendment rights. The Supreme Court reasoned that the State court judge who issued the warrant did so in a neutral and detached manner and the law enforcement officers followed it, acting in reasonable reliance.

In *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), the Supreme Court refused to suppress intrasovereign use of illegally seized evidence in a civil case, while agreeing that the evidence might have been suppressed in a criminal case. In holding that the exclusionary rule does not apply in a deportation proceeding, the Court balanced the potential for a deterrent effect against the loss of the probative evidence and its costs to the process of adjudication. In connection with the deterrent value of suppression, the Court considered, among other factors, statistical information tending to show a limited number of rights violations. The Court, however, went on to note that its "conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread." *INS v. Lopez-Mendoza*, 468 U.S. at 1050. There was no criminal proceeding involving the individual in *INS v. Lopez-Mendoza, supra*, and accordingly the use of the exclusionary rule was precluded even though there had been a violation of constitutional rights.

The Supreme Court's opinions reflect a trend of increased limitation upon the exclusionary rule's use and continued concern about whether it should be used in a civil setting. With these considerations in mind, we proceed to decide whether the exclusionary rule should be employed in this case.

### The Exclusionary Rule—Application in the Civil Case Context

The exclusionary rule has been considered and employed in numerous criminal cases. In the setting of a criminal case there is a greater need to consider whether an individual's rights have been protected. In a civil setting, it seems less

likely that the activity of Governmental agents could result in constitutional violations. See *INS v. Lopez-Mendoza, supra.* Accordingly, there are only a limited number of civil cases where courts have found violations of constitutional rights which resulted in a suppression of evidence under the exclusionary rule. Further limiting the available precedent is the fact that the alleged Fourth Amendment violation here occurred in connection with a deception which vitiated a person's consent to turn over documents. The cases more often involve physical or forced entry and illegal seizure of potential evidence by Government agents.

Due to these limitations, petitioners, in large part, rely on two cases which have similar facts to those considered here. The factual context we focus upon is one where a criminal investigation is conducted under the guise of an ostensible civil examination. That factual pattern was considered in *United States v. Tweel,* 550 F.2d 297 (5th Cir. 1977). In that case, Tweel's Federal income tax returns for 1958 through 1963 had been under civil tax examination in connection with an audit prior to the one before the Court. A special agent became involved in the earlier audit, but then withdrew. Concerning a later audit, a revenue agent informed Tweel and his wife by letter that he had been assigned to audit their Federal income tax returns for 1966 through 1968. Tweel's accountant specifically asked the revenue agent whether a "special agent" was involved, to determine whether Tweel was under criminal investigation. The revenue agent replied that no special agent was involved—a response that was technically correct. This response led the accountant to believe that his client, Tweel, was being subjected to a civil examination. The revenue agent did not disclose, however, that the audit was not a routine audit and that it was being conducted at the specific request of the U.S. Department of Justice for criminal purposes. Without being compelled by a summons, Tweel's accountant presented the accountant's retained records of Tweel's tax affairs to the revenue agent, as well as some of Tweel's records in the possession of the accountant. The accountant also obtained additional records from Tweel and voluntarily turned them over to the revenue agent.

In holding that Tweel had been deceived by the revenue agent and, consequently, his constitutional rights had been violated, the Circuit Court stated:

It is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent.

The burden for determining whether or not the government has resorted to a deception is on the moving party and this Court in each of the above cases set forth what that party must establish [citing and quoting *United States v. Prudden,* 424 F.2d 1021, 1033 (5th Cir. 1970)]:

We conclude that the mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, does not constitute fraud, deceit and trickery. Therefore, the record here must disclose some affirmative misrepresentation to establish the existence of fraud, and the showing must be clear and convincing. * * *

\*       \*       \*       \*       \*       \*       \*

Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading.

From the facts we find that the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent under the above standard and a flagrant disregard for appellant's rights. The silent misrepresentation was both intentionally misleading and material. * * *

* * * Miller [the revenue agent] obviously knew the accountant inquired whether a special agent was involved to determine whether he was conducting a criminal audit. Miller's response, although on the face of it true, misled appellant to such a degree that his consent to the "search" must be vitiated by the agent's silence concerning the origin of this investigation.

* * * Because the IRS requires *only* special agents to warn taxpayers of their rights, by assigning a revenue agent the IRS still succeeded in masking the undeniable criminal nature of this investigation and materially deceived this appellant.

\*       \*       \*       \*       \*       \*       \*

Since the consent given by appellant was obtained by deception, the microfilming of the documents constituted an unreasonable search in violation of the Fourth Amendment. * * *

[*United States v. Tweel, supra* at 299-300; citations and fn. refs. omitted.]

The facts in *Tweel* are similar to this case, with several important differences. *Tweel* was decided in connection with

a criminal case which places it outside of the doubts and concerns expressed by the Supreme Court in *Janis* and later cases. Also, the *Tweel* court accepted the agent's silence under the circumstances as an "affirmative misrepresentation," placing emphasis upon the inquiry made by the taxpayer's representative as to whether a criminal case was being conducted. In this same vein, as emphasized in *Weiss v. Commissioner,* 919 F.2d 115 (9th Cir. 1990), affg. a Memorandum Opinion of this Court, the evidence in this case was sought under the guise that it was being gathered for civil tax purposes, the very purpose for which it is being offered in this case.

The second case relied upon by petitioners is *United States v. Toussaint,* 456 F. Supp. 1069 (S.D. Tex. 1978), where a revenue agent began a civil audit of the income tax return of Toussaint, who also happened to be a revenue agent for the Internal Revenue Service. The Court found that, at some point, the examining revenue agent obtained a "firm indication of fraud" with respect to Toussaint's taxable year under examination. 456 F. Supp. at 1074. In violation of the Internal Revenue Manual, the revenue agent continued his "examination" for a considerable period of time thereafter without advising the taxpayer that the information being collected with his cooperation was to be used for criminal purposes. In *Toussaint,* special agents were not yet involved in the case at the time of discovering the "firm indication of fraud." The court found that "Persons are held to intend the natural and probable consequences of their actions." 456 F. Supp. at 1074. By continuing the investigation and not referring the case to CID after there was a firm indication of fraud, the revenue agent intended "to deceive Toussaint into believing that the investigation was routine and that criminal charges were not contemplated," in violation of Toussaint's Fourth Amendment rights. 456 F. Supp. at 1074.

*Toussaint,* in essence, involved the failure of the Government agent to follow the manual. *Toussaint* was decided in 1978 without the benefit of the Supreme Court opinion in *United States v. Caceres,* 440 U.S. 741 (1979), where it was held that not all violations of an agency's internal procedures rise to the level of constitutional violations. See also

*Vallone v. Commissioner,* 88 T.C. 794, 807 (1987); *Riland v. Commissioner,* 79 T.C. 185, 201 (1982). Moreover, courts have consistently held that the failure of the Commissioner's agents to warn a taxpayer that an audit may have potential criminal ramifications does not render a consent search of a taxpayer's records unreasonable under the Fourth Amendment. In *Vallone v. Commissioner, supra* at 811, we stated that:

when a routine tax audit has begun, the agent may obtain evidence of misreporting without warning the taxpayer of the changing direction of an examination. *United States v. Sclafani,* 265 F.2d 408 (2d Cir. 1959), cert. denied 360 U.S. 918 (1959). For, as the Court of Appeals succinctly stated in *Sclafani:*

A "routine" tax investigation openly commenced as such is devoid of stealth or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that the Government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasion, mistake and willful omission.
  [265 F.2d at 414-415.]

See also *United States v. Prudden,* 424 F.2d 1021, 1033 (5th Cir. 1970).

The above-discussed differences erode the applicability of the *Tweel* case and substantially minimize the effect, if any, that *Toussaint* could have upon this case.

### *The Effect of a Prior Sanction and the Purpose for Which the Documents or Information Is Being Obtained*

In *Weiss v. Commissioner, supra,* the Court of Appeals for the Ninth Circuit affirmed a Memorandum Opinion of this Court wherein we had refused to apply the exclusionary rule in a civil tax case. In *Weiss,* the U.S. District Court had dismissed a criminal case against the same taxpayer because of a finding of institutional bad faith. The "bad faith" was attributable to IRS employees' use of a civil summons for a criminal purpose, which was also in violation of internal manuals. In the civil tax case we refused to employ the exclusionary rule, in part, because the District Court's dismissal with prejudice had been a sufficient deterrent.

The Circuit Court in *Weiss v. Commissioner, supra,* agreed that the District Court's dismissal was a sufficient deterrent and stated:

The material subpoenaed is now being used for the fundamental purpose for which the IRS has always been authorized to obtain materials: the civil enforcement of the tax laws. The congressional intent behind limiting the IRS's summons authority to civil investigations * * * does not apply in this civil proceeding. Congress never intended to deny the IRS the civil discovery that is necessary for civil enforcement of the tax laws. Here, the fruit of the civil summonses in question is being used for a strictly civil purpose. [*Weiss v. Commissioner,* 919 F.2d at 118.]

### *Application of the Legal Principles to This Case*

In their suppression motion, petitioners assert that respondent's agents violated their constitutional rights by gathering evidence during a criminal investigation that was conducted under the guise of a civil audit. In essence, petitioners argue that, but for the conduct of respondent's agents, petitioners would not have provided certain evidence that was subsequently used in respondent's criminal prosecution and eventually in deficiency determinations.

In the setting of this case, no other court has considered whether there were constitutional violations and whether it would be appropriate, for deterrent purposes, to employ the exclusionary rule. We found no cases holding that the Commissioner's agent breaches a constitutional duty when the agent obtains information *merely* by failing to state specifically that he or she is conducting a criminal investigation. Compare *United States v. Irvine,* 699 F.2d 43, 46 (1st Cir. 1983), and cases cited therein. See also *United States v. Serlin,* 707 F.2d 953, 956 (7th Cir. 1983) (where it was held that "Simple failure to inform * * * [a taxpayer] that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless * * * [the taxpayer] inquired about the nature of the investigation and the agents' failure to respond was intended to mislead"); *United States v. Jaskiewicz,* 433 F.2d 415, 421 (3d Cir. 1970) ("There * * * [is] no affirmative duty on the part of the Government to disclose to * * * [the taxpayer] the extent and nature of * * * [the] investigation").

Although the conduct of a criminal investigation under the guise of a civil examination may result in constitutional violations in the context of a criminal case (*United States v. Tweel,* 550 F.2d 297 (5th Cir. 1977)), on balance, we hold that the exclusionary rule should not be employed in the civil setting of this case for reasons hereinafter discussed.

The effectiveness of the exclusionary rule is the subject of continued question by the courts and has been generally limited to direct and affirmative violations in the setting of criminal cases. Additionally, the factual scenario in this case is somewhat outside our scope of supervisory responsibility and the application of the exclusionary rule would not necessarily be appropriate.[8]

The alleged violations occurred prior to the issuance of the notice of deficiency, and if petitioners' factual allegations are correct, during the criminal investigation. Moreover, respondent's agents obtained petitioners' consent or cooperation under the guise of a civil examination. The statements and documents given to respondent's agents in that setting were submitted with the knowledge and consent that they might be used in a civil tax controversy. See *Weiss v. Commissioner,* 919 F.2d 115, 118 (9th Cir. 1990). To exclude such documents and evidence from a proceeding in which we are attempting to reach the truth or correctness of the parties' positions would be a substantial cost to the system. *INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984). This cost is not warranted here due to factors of remoteness and unsuitability of the sanction as it relates to the violation of the rights and the use of the fruits of such violation.

Petitioners' counsel, on the record, stated that the exclusionary rule and the concept of suppression were advanced to the U.S. Department of Justice lawyers in connection with discussions after petitioner was charged and prior to a criminal trial. Petitioner pleaded guilty to 2 of 18 counts concerning violations of criminal tax statues. Petitioners' counsel believed that petitioner was allowed to plead guilty to one individual count and one corporate count, to some degree, due to the allegation of the violation of constitu-

---

[8]In reaching our conclusion here, we do not preclude the use of the exclusionary rule involving a Fourth Amendment rights violation within the context of a civil case.

tional rights. This is obviously different from *Weiss v. Commissioner, supra,* where the U.S. District Court employed the exclusionary rule and dismissed the criminal case. To some extent, however, the possibility of a more lenient plea agreement serves the primary purpose or focus of the exclusionary rule—to suppress evidence or employ sanctions as a deterrent to future constitutional violations. The Government (respondent) may have been "sanctioned" (although self-imposed) here due to a less successful prosecution.

Accordingly, we hold that petitioners' motion seeking to sanction respondent by suppression of evidence or shifting of the burden of going forward to respondent will be denied, and the exclusionary rule will not be employed in the setting of this case.

Even if the holding of *United States v. Tweel, supra,* were applicable here, our record presents a close case concerning whether a Fourth Amendment violation occurred. There are certain differences which could distinguish this case from *Tweel.* To prevail, petitioners must show by clear and convincing evidence the fraud or deceit on the part of the IRS. See *Vallone v. Commissioner, supra* at 809-810, and cases cited therein; *United States v. Prudden,* 424 F.2d 1021 (5th Cir. 1970).

Initially, we point out that the majority of evidence tending to show that a criminal investigation was being conducted under the guise of a civil examination was circumstantial. Although we would not generally expect to see direct evidence of activity labeled as "deceitful," "misrepresentation," or "fraudulent," the cases in this area require clear and convincing evidence.

Additionally, an "affirmative misrepresentation" is prerequisite to a finding of a Fourth Amendment violation in this type of situation. See *United States v. Powell,* 835 F.2d 1095, 1098-1099 (5th Cir. 1988). In *United States v. Tweel, supra,* although the agent made no affirmative misrepresentation, the Circuit Court held that the "silent misrepresentation was both intentionally misleading and material." 550 F.2d at 299. In this case it would be difficult to decide whether Revenue Agent Waldrep had made a "silent misrepresentation [that] was both intentionally misleading

and material." In *Tweel*, the agent was asked whether a criminal investigation was being conducted and a negative response was made that was technically correct but practically misleading. In this case no inquiry was made and it is likely no explanation was expected by petitioners as evidenced by their cooperation with Revenue Agent Waldrep.

Finally, we do not intend to condone any illegal or improper activity that may have occurred by declining to suppress evidence or otherwise sanction respondent in the setting of this case. Even though petitioners were unsuccessful in their motion to suppress, they have shown certain types of activity by respondent's agents which were either inappropriate and/or reprehensible. Although we do not extend the holding of *Tweel* to this civil case, *Tweel* also stands for the proposition that the Commissioner's agents are expected to deal in an honest and forthright manner when acting in their official capacity and may not abuse the power of their positions by deceiving a taxpayer in order to gain access to that taxpayer's files. See *United States v. Centennial Builders, Inc.*, 747 F.2d 678, 682 (11th Cir. 1984). Any attempt to conduct a criminal investigation under the guise of a civil examination would have a chilling effect upon the normal demeanor of the parties in civil examinations. As stipulated by the parties in this case, taxpayers are generally more cooperative in the setting of a civil examination, as opposed to criminal investigations where different procedures and rights are involved.

A number of facts are most troublesome. For example, Revenue Agent Waldrep's actual motives may have been revealed by her repeated (and successful) attempts to question Jones without the assistance of his attorney. Waldrep's actions in calling Jones from his attorney's office and implying that she was doing so with his attorney's consent and in his attorney's presence are reprehensible and, in the setting of this case, provide strong evidence of the deceitful nature of the agents' activities. Waldrep's excuse for her actions (that a typographical error rendered petitioners' personal power of attorney invalid) is a feeble and insincere attempt to legitimize her actions. Once access to Jones was terminated, Waldrep, without delay or further investigation, referred the case to CID for a criminal

investigation. Although we have found it unnecessary to conclude that petitioners' rights were violated, it is evident that this was a close question and that it could have been decided unfavorably to respondent.

To reflect the foregoing,

*An appropriate order will be issued.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, HAMBLEN, COHEN, CLAPP, WRIGHT, PARR, RUWE, WHALEN, and HALPERN, *JJ.*, agree with the majority.

KÖRNER, SHIELDS, SWIFT, and JACOBS, *JJ.*, concur in the result only.

---

BEGHE, *J.*, concurring: This Court, having no general supervisory authority over respondent's operations (see *United States v. Payner*, 447 U.S. 727, 731, 737 (1980)), has traditionally refrained from trying to tell him how to do his job. However, the misconduct of respondent's agents in this case has been so egregious that I feel compelled to urge respondent to take some action, if he has not already done so, to reduce the likelihood of comparable misconduct in future cases.

CHABOT and COLVIN, *JJ.*, agree with this concurring opinion.