T.C. Memo. 1998-72

UNITED STATES TAX COURT

ROGER W. MILLER, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 128-96.          Filed February 23, 1998.

Robert J. Chicoine, Larry N. Johnson, John Mark
Colvin, and Darrell D. Hallett, for petitioner.
William A. McCarthy, for respondent.

MEMORANDUM OPINION

COHEN, Chief Judge:  Petitioner Roger W. Miller's
Unopposed Motion for a Separate Trial on the Exclusionary
Issue was granted, and evidence was taken on this
preliminary matter.  The issue now before the Court is
whether the exclusionary rule should be applied to suppress,
at a separate trial on the deficiency issue, evidence seized
at the Bellingham, Washington, airport by a U.S. Border

Patrol agent and evidence obtained as a result of that seizure. Petitioner resided in East Orland, Maine, at the time he filed his petition.

## Background

### Border Patrol Seizure

On February 28, 1993, petitioner and a companion, James Goncalo (Goncalo), arrived at the Bellingham, Washington, airport intending to board a flight to Los Angeles, California. Petitioner and Goncalo arrived at the airport 15 to 20 minutes before their flight was scheduled to depart.

As the two men walked towards the airport terminal from the airport lot where they had parked their car, George T. Reese (Reese), a senior patrol agent of the U.S. Border Patrol (Border Patrol), noticed the men. Reese was working alone at the Bellingham airport and bus station looking for illegal aliens headed towards the interior of the United States. As a Border Patrol officer, Reese's primary function was the enforcement of immigration laws of the United States. As a secondary function, Reese was authorized by letters from the U.S. Drug Enforcement Administration (DEA) and the U.S. Customs Service (Customs Service) to investigate certain Federal narcotics and currency violations. The enforcement of customs laws

sometimes involves the seizure of cash being illegally transported across the international border. In Reese's experience, narcotics and currency couriers, who frequently use Bellingham airport, travel lightly.

Reese, dressed in full Border Patrol uniform to include a visible sidearm, approached petitioner and Goncalo at the entrance of the airport. Petitioner and Goncalo were each carrying one small carry-on bag. Reese asked the two men where they were from and for identification. Petitioner unzipped his carry-on bag to obtain his driver's license. Petitioner and Goncalo each handed his driver's license to Reese, who examined the licenses. After asking where petitioner and Goncalo were from and looking at their driver's licenses, Reese no longer suspected that petitioner and Goncalo were not U.S. citizens. Reese did not return the driver's license to petitioner at that time.

After looking at petitioner's and Goncalo's driver's licenses, Reese asked to see their airplane tickets. Petitioner's and Goncalo's tickets were in the names of R. Johnson and J. Johnson. Petitioner claimed that the tickets were not in his and Goncalo's names because he had purchased them from a man in a bar who offered him a "good buy". Although Reese knew that traveling under fictitious names is a common practice, he did not believe petitioner's

explanation about the tickets and his suspicions regarding petitioner increased. Petitioner's explanation about the tickets was untrue and was the first of numerous lies that petitioner told Reese and other law enforcement officers that day. Reese did not give the tickets back to petitioner.

Reese next inquired about the purpose of petitioner's trip. Petitioner replied that he and Goncalo were traveling to Los Angeles to purchase automobiles. Because this explanation is commonly used by currency violators and narcotics dealers who carry large amounts of money, Reese began to suspect that petitioner and Goncalo were narcotics or currency smugglers.

Reese asked petitioner how he intended to pay for the automobiles. Petitioner told Reese that he was carrying approximately $600 in cash. Reese discovered that petitioner and Goncalo were carrying $138,921 of currency in their bags.

After Reese discovered the currency, he, petitioner, and Goncalo went to the Border Patrol station in a Border Patrol vehicle (patrol car). By the time they arrived at the Border Patrol station, Reese suspected that the currency that petitioner had been carrying could be proceeds from criminal activity. At the station, Reese had petitioner and

Goncalo empty their pockets and placed them in a holding cell. The Border Patrol station had limited space. Reese continued to question petitioner and Goncalo together and individually. When not being questioned, petitioner and Goncalo sat in the holding cell.

During questioning at the Border Patrol station, Reese asked petitioner if he had filed tax returns in the past. Reese noted these tax questions in his routine report of the incident. Asking questions about tax returns is not standard practice for Border Patrol agents.

After questioning petitioner and Goncalo on his own at the Border Patrol station, Reese telephoned DEA Special Agent Robert D. Parks (Parks) at his home and asked him to come to the station to talk with petitioner. After Parks arrived and asked petitioner questions, Parks telephoned Customs Service agents and asked them to talk to petitioner. Two or three Customs Service agents came to the station and asked petitioner questions.

After petitioner was questioned by a total of four or five officers, he was told he was free to leave. The officers did not return petitioner's wallet or any of the seized currency before petitioner left the station.

Reese did not inform petitioner that petitioner could refuse to answer his questions, refuse to accompany him to

the Border Patrol station, or terminate the encounter at any time. Reese did not provide Miranda warnings to petitioner or Goncalo at the airport or at anytime that day. Reese had received training in how to determine, in a given situation, whether there is probable cause that a crime has been committed. Reese had also received training both at the Border Patrol Academy and at numerous post-academy training courses in how to conduct appropriately an investigative search. In the course of Reese's 27-year career at the Border Patrol, he had participated in approximately 30 narcotics seizures at the Bellingham airport and approximately 40 currency seizures.

Agency Relationships

There was no formal or informal agreement to exchange information between the Internal Revenue Service (IRS) and the Border Patrol in Bellingham, Washington. The IRS did not participate in the subject search and seizure.

Special Agent James Howisey (Howisey), a Criminal Investigation Division (CID) agent for the IRS, traveled to the DEA office in Blaine, Washington, approximately once a year while he was assigned to the Everett, Washington, IRS office. Howisey met with DEA agents at the Blaine DEA office to discuss IRS CID functions and describe types of cases that might make good tax cases. When Howisey visited,

he would tell the DEA agents what kinds of things interested him, and they would try to recall cases that might fit his criteria. DEA agents in the Blaine office understood that Howisey would be interested in cases involving large amounts of currency or assets with a clear drug connection. When Howisey visited the Blaine DEA office on August 17, 1994, DEA agents mentioned that he might want to look at petitioner's file as well as approximately six other files that might have potential as tax cases.

During the period in question (February 1993 to August 1994), Parks was the resident agent in charge of the Blaine, Washington, DEA office. Parks personally selected files that he thought would be most relevant to share with the IRS.

DEA agents in the Blaine office work closely with the Customs Service and the Border Patrol on currency cases. The Blaine DEA office operated drug task forces that included representation from the Border Patrol, the Royal Canadian Mounted Police, and State and local police, but not the IRS. <u>Procedural History</u>

The Government brought an action in the U.S. District Court for the Western District of Washington to forfeit the money seized from petitioner and Goncalo on the theory that it was the proceeds of narcotics trafficking. Petitioner

filed a claim in District Court asserting that he owned the currency, that it was not the proceeds of narcotics trafficking, and that evidence of the currency should be suppressed in the District Court proceeding because it was the product of an unconstitutional search and seizure in violation of the Fourth Amendment. The District Court granted petitioner's motion to suppress the evidence seized in the search and all statements made by petitioner after the search as fruit of the unlawful seizure, stating:

> What happened on February 28, 1993, as shown by the evidence, is that an experienced officer had a hunch that two young men might be transporting drug proceeds; he did not have probable cause or a reasonable suspicion supported by articulable facts. He stopped and questioned the two men in a way that placed them under his control after the first few moments. Consent given under what the subject feels to be compulsion is not voluntary. * * * Here, if consenting words were in fact uttered, they were not spoken voluntarily.

United States v. $138,921 in U.S. Currency, No. C93-1116WD, slip op. at 4-5 (W.D. Wash., July 27, 1994) (order on motion to suppress). The District Court held that the Government did not sustain its burden of proof to show consent and there was no other basis on which the warrantless search could be held lawful. Id. at 5. Petitioner subsequently consented to forfeiture of $18,921 of the seized currency, and the remaining $120,000 was returned to him.

Respondent determined deficiencies in income tax resulting from unreported income earned from 1989 to 1993, as well as amounts due for failure to pay estimated tax.

## Discussion

Petitioner contends that, under the principles of collateral estoppel, respondent is barred from contesting the District Court finding that petitioner's constitutional rights were violated in the search and seizure. We assume, for purposes of this proceeding, that petitioner's constitutional rights were violated by the seizure at the Bellingham airport. Cf. Houser v. Commissioner, 96 T.C. 184, 204 (1991).

Assuming that his rights were violated, petitioner contends that the exclusionary rule must be applied if: (1) tax violations were within Reese's "zone of primary interest", (2) there was a demonstrable understanding that information gathered by one agency could be utilized by another, or (3) Reese did not act in good faith during the search and seizure. Petitioner further contends that all three of these things occurred and that all evidence obtained as a result of the seizure at the Bellingham airport should be suppressed in this case. Respondent maintains that none of the three circumstances describe the

instant case and that the exclusionary rule should not be applied. We consider these contentions seriatim.

"Zone of Primary Interest"

In United States v. Janis, 428 U.S. 433, 458 (1976), the U.S. Supreme Court mentioned a seizing officer's "zone of primary interest" but did not elaborate on the phrase. Courts have focused on officers' zones of primary interest to predict whether applying the exclusionary rule in various contexts would deter future unlawful searches and seizures. See Grimes v. Commissioner, 82 F.3d 286, 290 (9th Cir. 1996); Wolf v. Commissioner, 13 F.3d 189, 194-196 (6th Cir. 1993), affg. T.C. Memo. 1992-432; Adamson v. Commissioner, 745 F.2d 541, 546 (9th Cir. 1984), affg. T.C. Memo. 1982-371; Tirado v. Commissioner, 689 F.2d 307, 314 (2d Cir. 1982), affg. 74 T.C. 14 (1980); Black Forge, Inc. v. Commissioner, 78 T.C. 1004, 1011-1012 (1982).

Presumably, if the proposed use of the evidence is close to a seizing officer's zone of primary interest, the inference is stronger that the officer had this use in mind when making the seizure. Tirado v. Commissioner, supra at 311. To estimate an officer's zone of primary interest, courts rely on commonsense assumptions about "human nature and the interrelationship of the various components of the law enforcement system." United States v. Janis, supra at

459; Grimes v. Commissioner, supra at 289. Estimations of an officer's zone of primary interest might also include whether an officer likely contemplated the particular challenged use of the evidence at the time of seizure and, if so, whether such use likely motivated him or her. See Tirado v. Commissioner, supra at 311.

As a member of the Border Patrol, Reese's primary function was to enforce immigration laws of the United States. As a secondary function, Reese was authorized by the DEA and Customs Service to enforce certain Federal narcotics and currency laws. On the day of the subject search and seizure, Reese was assigned to surveillance at the Bellingham airport and bus station. Considering his primary and secondary functions and specific assignment on the day the search and seizure occurred, we conclude that tax concerns were not within Reese's zone of primary interest. See Grimes v. Commissioner, supra at 290 (enforcement of civil tax law secondary to FBI agent); Tirado v. Commissioner, supra at 314 (DEA agents have no general motivating interest to assist enforcement of civil tax obligations).

Although incongruous conduct of a seizing officer might affect our determination of an officer's zone of primary interest, e.g., Tirado v. Commissioner, supra at 312, we

find no such conduct in the instant case.  Although it is not standard practice in the Border Patrol to ask people who are carrying large amounts of currency questions about tax returns, Reese explained that he asked petitioner tax questions to determine whether petitioner had a legitimate source for his income.  Reese's questions about petitioner's tax returns in the circumstances of this case do not indicate that tax violations were in his zone of primary interest.

## Agreement Between Agencies

Petitioner contends that an agreement to share information between agencies in this case mandates application of the exclusionary rule.  Courts frequently examine whether agreements exist between agencies, to determine whether suppressing evidence illegally obtained by one agency and offered by another will deter future unlawful searches and seizures.  Grimes v. Commissioner, supra at 290; Wolf v. Commissioner, supra at 195; Tirado v. Commissioner, supra at 314-315; Guzzetta v. Commissioner, 78 T.C. 173, 180-182 (1982); Black Forge, Inc. v. Commissioner, supra at 1011.  Although generally recognizing that such agreements increase the likelihood that deterrence will be achieved by applying the exclusionary rule, courts have considered a variety of elements in determining whether the

arrangements before them are of the sort that would warrant excluding the evidence. Grimes v. Commissioner, supra at 290 (no preexisting implicit or explicit agreement); Wolf v. Commissioner, supra at 195 (no explicit agreement); Tirado v. Commissioner, supra at 314-315 (no general policy, liaison agreement, or specific agreement on specific case regarding exchange of information; no explicit and demonstrable understanding); Guzzetta v. Commissioner, supra at 180-182 (discretionary liaison insufficient); Black Forge, Inc. v. Commissioner, supra at 1011 (no prior agreement).

We reject petitioner's contention that the Blaine, Washington, DEA office practice of periodically permitting IRS agents to review case files mandates application of the exclusionary rule. Petitioner's position that a seizing officer's agency need not be involved in an agreement to mandate application of the exclusionary rule is unsupported and unpersuasive. See United States v. Janis, supra at 448 (seizing officer is primary object of sanction). Petitioner argues that suppressing the evidence will achieve deterrence because, although the alleged agreement was between the IRS and DEA, the Border Patrol officer who seized the evidence was authorized by the DEA to enforce certain Federal narcotics violations. We cannot conclude that deterrence

would be achieved through this attenuated connection. See United States v. Janis, supra at 448-454 (discussing effect attenuation has on deterrence in application of exclusionary rule).

There is no evidence of an agreement that directly links the Border Patrol and the IRS. Moreover, even if, instead of the DEA, the practice were between the Border Patrol and the IRS, the type of informal, voluntary, and discretionary one-way transfer of information that occurred in this case would be insufficient to justify application of the exclusionary rule. See Guzzetta v. Commissioner, supra at 181-182. Therefore, no agreements between agencies in this case justify imposition of the exclusionary rule.

Bad Faith

Petitioner's contention that the exclusionary rule should be applied because Reese did not act in good faith when he seized the subject evidence is based on the supposition that, although primary, deterrence is not the only consideration for exclusionary rule application. See INS v. Lopez-Mendoza, 468 U.S. 1032, 1050-1051 (1984) (egregious Fourth Amendment violations might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained); Elkins v. United States, 364 U.S. 206, 222 (1960) (in addition to deterrence, the

rule works to preserve judicial integrity). Petitioner urges the application of a negligence standard of bad faith and relies in part on events occurring at the Border Patrol station subsequent to the seizure of cash at the airport. Petitioner recognizes that Reese's conduct at the airport was "not a significant departure from the rules of engagement enjoyed by border patrol agents at the border." We are not persuaded that Reese's actions are the type of egregious violations that should lead to exclusion of evidence other than as previously ordered by the District Court. Even in cases where questionable conduct is attributable to IRS agents, suppression of evidence generally is not a suitable sanction in a civil tax case. Weiss v. Commissioner, 919 F.2d 115, 118-119 (9th Cir. 1990), affg. T.C. Memo. 1988-586; Jones v. Commissioner, 97 T.C. 7, 27 (1991). Nothing about this case causes us to reexamine the consistent refusal of courts to apply the exclusionary rule in this context.

We have considered the other arguments of the parties, and they are either without merit or unnecessary in view of our resolution of the issues. There is no basis for suppressing evidence in this case.

An Order calendaring

this case for further trial

<u>will be issued</u>.